IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

RICHARD A. WRIGHT, et al.,

    *Plaintiffs,*

    v.

CARROLL COUNTY BOARD OF
EDUCATION, et al.,

    *Defendants.*

Civil Action No.: 11-cv-3103

## MEMORANDUM OPINION

In their "First Amended Complaint," plaintiffs Richard A. Wright and Amy M. Wright

(the "Wrights"), as parents and next friends of R.W., their minor child, lodged several claims

related to the alleged bullying of their "special needs" son in the fall of 2008, when he was a fifth

grade student at Carrolltowne Elementary School ("Carrolltowne") in Sykesville, Maryland.

They have sued the following defendants, in their individual and official capacities: the Carroll

County Board of Education (the "Board"); Jennifer A. Seidel, President of the Board; Barbara J.

Shreeve, Vice President of the Board; Gary W. Bauer, Cynthia L. Foley, and Virginia R.

Harrison, members of the Board; Steven H. Guthrie, Superintendent of the Carroll County Public

School System (the "School System"); Curtis T. Schnorr, Director of Elementary Education for

the Board; Russell S. Gray, Director of Special Education at Carrolltowne; Terry Ball, Principal

of Carrolltowne; Shavon T. Showers, Assistant Principal of Carrolltowne; and Michelle Fliegel,

a teacher at Carrolltowne. *See* First Amended Complaint (hereinafter, "Complaint," ECF 7).[1]

---

[1] As the Complaint is based on claims arising under federal statutes, this Court has
federal question jurisdiction under 28 U.S.C. § 1331. In addition, the Court has supplemental
jurisdiction as to the state law claims, pursuant to 28 U.S.C. § 1367.

In particular, the suit contains four counts, for which plaintiffs seek both compensatory and punitive damages and unspecified injunctive relief. *Id.* at 14.[2]  In Count I, plaintiffs assert a "Claim for Deprivation of Constitutional Rights under 42 U.S.C. § 1983, 20 U.S.C. § 1400." They allege that defendants' "pattern of customs, usages and practices . . . including being deliberately neglectful of the abusive and violent conduct, deprived R.W. of his federal and state rights to a free appropriate public education [('FAPE')], under the color of state law, in violation of 42 U.S.C. § 1983 and IDEA [the Individuals With Disabilities Education Act]", codified at 20 U.S.C. § 1400 *et seq*. *Id.* ¶ 34.  Count II sets forth a "Claim for Deprivation of Constitutional Rights under 42 U.S.C. § 1985 and 20 U.S.C. § 1400," asserting that defendants "individually and in concert with one another, deprived the Plaintiff, R.W., of his right to a [FAPE] under [the IDEA] by failing to impose discipline against" a student who "bullied" R.W., and "effectively imposing discipline against [R.W.]…." *Id.* ¶ 40.  Count III brings a claim for "Violation of Title VII[3] / Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794," claiming defendants "fail[ed] to ensure that R.W. was not the victim of invidious discrimination by virtue of his disability…." *Id.* ¶ 44.  And, Count IV contains a claim for "Common Law Gross Negligence," alleging that defendants breached their duty of care to R.W. "by failing to ensure he was not the victim of invidious and purposeful discrimination." *Id.* ¶ 48.

Pursuant to Fed. R. Civ. P. 12(b)(6), defendants have filed a motion to dismiss for failure to state a claim upon which relief can be granted ("Motion," ECF 11), along with a supporting memorandum ("Memo," ECF 11-1).  Plaintiffs filed an opposition (ECF 18) and a supporting

---

[2] Upon amendment of suit, plaintiffs abandoned certain claims, and the remaining claims are misnumbered.  The four counts are identified as Count I, Count II, Count IV, and Count V. Because the parties now refer to Count IV as Count III, and Count V as Count IV, I shall do the same.

[3] Presumably, plaintiffs refer to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*.

memorandum ("Opposition," ECF 18-1), to which defendants replied ("Reply," ECF 19).   The Court now rules pursuant to Local Rule 105.6, no hearing being necessary.

**Factual Background**

R.W. was born in May 1997.  Complaint ¶ 1.  He is "a special needs child, suffering from the developmental disorder known as autism."  *Id.*  During the September 2008 school term, R.W. was a fifth grade student at Carrolltowne.  *Id.* ¶ 15.[4]  As a student with a developmental disability, R.W. is entitled to a FAPE under the IDEA.  *Id.*  Because his academic performance was "above average prior to experiencing the events complained of" in this suit, he "was on an educational track to graduate from elementary school to middle school."  *Id.*

On or about October 22, 2008, R.W. was attacked at school by "a male peer," referred to as "M."  *Id.* ¶ 16.  As a result of the incident, R.W.'s "eyes were blackened and his lower lip was swollen."  *Id.* ¶ 17.  R.W. was also attacked "on other occasions both prior to and subsequent to" the incident of October 22, 2008.  *Id.* ¶ 16.[5]

At the inception of the 2008-2009 school year, R.W. "expressed fears of reporting to school," and became "extremely school avoidant after the October 22, 2008 incident."  *Id.*  As early as September 2, 2008, Ms. Wright reported R.W.'s fear of reporting to school to

---

[4] At the outset of their Complaint, plaintiffs set forth a four page "Introductory Statement" about "[t]he contemporary social problem of school bullying and the emotional toll it exacts upon its child victims…."  *Id.* at 2.  In addition, they discuss the "emergent body of both state and federal decisional law" that "chronicles the efforts of parents and child victims to procure relief" under various legal theories.  *Id.*  These assertions are omitted from the summary of facts.  However, the Court has construed the facts alleged in the Complaint in the light most favorable to plaintiffs, as the parties opposing the Motion.  *See Philips v. Pitt County Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

[5] It is not clear whether these other attacks were perpetrated by M. or by other students at Carrolltowne, although context suggests M. was the perpetrator.  These incidents included R.W. "being stabbed at or struck with pencils" and "being pushed and punched."  *Id.* ¶ 18.  The Complaint alludes to an incident that allegedly occurred on October 28, 2008, without providing specific details.  *Id.* ¶ 16.

unspecified "school officials," after having previously communicated her concerns to R.W.'s teacher, Ms. Fliegel, by way of a note. *Id.* "[S]everal other communiqués" passed between Ms. Wright and unspecified Carrolltowne "staff" and, "in late September and early October, 2008," Ms. Ball assured Ms. Wright "that the situation was viewed with appropriate gravity and would be dealt with appropriately." *Id.*

Subsequent to the occurrence of October 22, 2008, Ms. Wright asked "to visit the school to observe the instructional circumstance in R.W.'s classroom," but "[s]chool administration" refused her request. *Id.* ¶ 17. She then contacted Mr. Schnorr, who arranged "a three-day period of observation at R.W.'s classes from October 27-29, 2008." *Id.* ¶ 18. During the observation period, Ms. Wright noticed that R.W. was seated "in very close proximity" to M. *Id.* She also had "face to face conversations with many of R.W.'s teachers, several of whom indicated that they had no specific information about the bullying attacks visited upon R.W. by M. from members of [the] school administration." *Id.* ¶ 21. The Complaint alleges: "At that point, it became clear to Mrs. Wright that [the] school administration had not exercised any specific control over the circumstance, had failed to adequately train teachers and other instructional staff, appearing deliberately indifferent to the attacks." *Id.*

At some point after the attacks, R.W. was "placed in a lower grade level" and taken off the "'graduation' academic track." *Id.* ¶ 19.[6] According to plaintiffs, R.W. "was not afforded the opportunity to pursue his education" at Carrolltowne "in the least restrictive environment." *Id.* He "began to suffer obvious psychological symptoms," and entered treatment with a psychiatrist, who diagnosed R.W. with post-traumatic stress disorder ("PTSD"). *Id.* ¶ 20. R.W. also began treatment with a licensed clinical social worker, who also diagnosed R.W. with

---

[6] In their Complaint, plaintiffs do not state why or when R.W.'s grade placement was changed.

PTSD.  *Id.*  Plaintiffs aver that, as a consequence of the PTSD, R.W. "now suffers from a debilitating ancillary condition known as rectal prolapse, which may require surgical intervention."  *Id.*

After the 2008 Thanksgiving holiday, R.W. did not return to Carrolltowne.  *Id.* ¶ 21. Rather, he "received home services" for the remainder of the 2008-2009 school year.  *Id.* Plaintiffs explain: "Successive attempts to return [R.W.] to a school environment resulted in R.W. becoming extremely anxious, to the point of him becoming physically ill."  *Id.*[7]  After the Wrights withdrew R.W. from Carrolltowne, they retained counsel and commenced "the administrative process of procuring a modified Individual Education Plan ['IEP'] for R.W., with the goal of placing him somewhere" other than Carrolltowne.  *Id.* ¶ 22.  The process "required the greater part of two years of advocacy with school officials."  *Id.*  But, R.W. was ultimately granted "the necessary out-placement at the Harbour School he requires…."  *Id.* at 5.[8]

In addition to the legal fees incurred for an "education attorney," *id.* ¶¶ 22-23, the Wrights have incurred "health treatment costs" for R.W.  *Id.* ¶ 24.  They also suffered lost wages and other expenses as a result of attending "IEP meetings and mental health treatment services for R.W."  *Id.* ¶ 25.

In their Complaint, plaintiffs aver that they have "exhaust[ed], for all intents and purposes, administrative remedies, since further administrative process would be futile" and "the administrative process…is inadequate in the current circumstance, given the relief sought here, i.e., money damages."  *Id.* ¶ 26.  Further, they complain that, since commencement of this suit, "Carroll County Board of Education speech pathology instructional personnel have terrorized [R.W.], by asking him to discuss in his speech pathology class photographs of judicial personnel

---

[7] Plaintiffs do not specify when these "successive attempts" were made.

[8] It is unclear when R.W. was placed at the Harbour School.

purportedly engaged in heated conversation with defendant or litigant subjects," which plaintiffs insist is "designed specifically to frighten or terrorize [R.W.] with the prospect of having to testify at trial" in this case. *Id.* ¶ 27.

## Standard of Review

Under Fed. R. Civ. P. 8(a)(2), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendant with "fair notice" of the claim and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555-56 n.3 (2007) (citation omitted). To be sure, the plaintiff need not include "detailed factual allegations in order to satisfy" Rule 8(a)(2). *Id.* at 555. But, the rule demands more than bald accusations or mere speculation. *Id.* To satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Id.* at 556. A complaint that provides no more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of action," is insufficient under the Rule. *Id.* at 555.

A defendant may test the adequacy of a complaint by way of a motion to dismiss under Rule 12(b)(6). *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010); *German v. Fox*, 267 F. App'x 231, 233 (4th Cir. 2008). A Rule 12(b)(6) motion constitutes an assertion by the defendant that, even if the facts that the plaintiff alleges are true, the complaint fails, as a matter of law, "to state a claim upon which relief can be granted." Therefore, when deciding a motion to dismiss pursuant to Rule 12(b)(6), a court "'must accept as true all of the factual allegations contained in the complaint,'" and must "'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440

(4th Cir. 2011) (quoting *Erickson v. Pardus,* 551 U.S. 89, 94 (2007), and *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009)).  The court may also consider documents "attached or incorporated into the complaint," as well as documents attached to the motion to dismiss, "so long as they are integral to the complaint and authentic." *Philips*, *supra*, 572 F.3d at 180; *see E.I. du Pont de Nemours & Co.*, 637 F.3d at 448.[9]

In resolving a Rule 12(b)(6) motion, the court is not required to accept legal conclusions drawn from the facts.  *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Monroe v. City of Charlottesville, Va.*, 579 F.3d 380, 385-86 (4th Cir. 2009), *cert. denied*, ___ U.S. ___, 130 S. Ct. 1740 (2010).  Moreover, a motion pursuant to Rule 12(b)(6) ordinarily "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999) (internal quotation marks omitted).  But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint," the court may resolve the applicability of a defense by way of a Rule 12(b)(6) motion.  *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007).  "This principle only applies, however, if all facts necessary to the affirmative defense '*clearly appear[] on the face of the complaint.*'"  *Id.* (quoting *Richmond, Fredericksburg & Potomac R.R. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993)) (emphasis in *Goodman*).

Both *Twombly*, 550 U.S. 544, and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), make clear that, in order to survive a motion to dismiss under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570; *see Iqbal*, 556 U.S. at 684 ("Our decision in *Twombly* expounded the pleading standard for 'all civil

---

[9] Defendants appended two exhibits to their Motion: a courtesy copy of *Bulgarino v. Howard County Board of Education*, No. 10-cv-2380 (D. Md. Sept. 12, 2011) (Appendix I) and the Affidavit of Stephen H. Guthrie (Appendix II).  I have not considered the Guthrie affidavit for any purpose.

actions'. . ." (citation omitted)); *see Simmons v. United Mortgage and Loan Inv.*, 634 F.3d 754, 768 (4th Cir. 2011); *Andrew v. Clark*, 561 F.3d 261, 266 (4th Cir. 2009); *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). Thus, a Rule 12(b)(6) motion will be granted if the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679 (citation omitted). "A court decides whether this standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to relief. *A Society Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011). Dismissal "is inappropriate unless, accepting as true the well-pled facts in the complaint and viewing them in the light most favorable to the plaintiff, the plaintiff is unable to 'state a claim to relief.'" *Brockington v. Boykins*, 637 F.3d 503, 505-06 (4th Cir. 2011) (citation omitted).

## Discussion[10]

### *Exhaustion of Administrative Remedies*

In my view, plaintiffs' failure to exhaust administrative remedies precludes their IDEA claims, set forth in Count I and Count II. I reach the same result as to the claims under Title VII

---

[10] Although defendants advance multiple grounds to support their Motion, it is unnecessary for me to address all of their contentions. In addition to their arguments on the merits, defendants contend, in a footnote, that ECF 7 is actually plaintiffs' *second* amended complaint, as plaintiffs had previously filed a "corrected" version (ECF 3) of their original complaint (ECF 1), and that, "pursuant to Fed. R. Civ. P. 15(a), Plaintiffs were required to seek leave of Court or consent of counsel before filing" ECF 7, as parties are only permitted one opportunity to amend their pleadings as a matter of course. Memo at 3 n.3. Defendants assert: "Plaintiffs have taken neither course of action, and [ECF 7] should therefore be stricken for noncompliance with Rule 15." *Id*.

I am unconvinced that ECF 3 constitutes an "amended complaint" within the meaning of Fed. R. Civ. P. 15. In actuality, ECF 3 "merely correct[ed] three typographical errata in the earlier version[, ECF 1, which]…referred to 'Deborah Wright' instead of 'Amy M. Wright' and made a couple of errors spelling out dollar amounts." *See* ECF 3. In any event, I need not resolve this contention.

and § 504, set forth in Count III.

With respect to Counts I and II, the IDEA "provides a panoply of procedural rights to parents to ensure their involvement in decisions about their disabled child's education." *Sellers v. Sch. Bd. of City of Manassas*, 141 F.3d 524, 527 (4th Cir.), *cert. denied*, 525 U.S. 871 (1998). Parents may also "present complaints with respect to such matters." *Id*. (citation omitted). And, such complaints may be addressed at an "'impartial due process hearing.'" *Id*. (citation omitted).

In this regard, 20 U.S.C. § 1415(f)(1)(a) states:   "Whenever a complaint [alleging a violation of the IDEA] has been received…the parents or the local educational agency involved in such complaint shall have an opportunity for an impartial due process hearing, which shall be conducted by the State educational agency or by the local educational agency, as determined by State law or by the State educational agency."  Section 1415(g)(1) of 20 U.S.C. is also relevant: "If the hearing required by subsection (f) is conducted by a local educational agency, any party aggrieved by the findings and decision rendered in such a hearing may appeal such findings and decision to the State educational agency."  And, 20 U.S.C. § 1415(i)(2)(A) is pertinent:

> Any party aggrieved by the findings and decision made under subsection (f)…who does not have the right to an appeal under subsection (g)…shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States, without regard to the amount in controversy.

As indicated, the federal statute refers to state law.  Therefore, Md. Code (2008 Repl. Vol), §§ 8-413(d), (e), and (j) of the Education Article are pertinent.  These sections establish that, upon the filing of a "due process complaint," an administrative law judge, serving as the "impartial hearing officer" required by the IDEA, shall conduct a hearing, the result of which can be appealed within 120 days to federal court or to the circuit court for the county in which the child resides.

Accordingly, plaintiffs were required to exhaust their administrative remedies prior to bringing suit.  In *Koster v. Frederick County Board of Education*, 921 F. Supp. 1453, 1455 (D. Md. 1996) (citations omitted), Judge Benson Legg explained:

> Congress created a detailed administrative scheme for aggrieved parents to pursue in order to exhaust their remedies under IDEA before filing a federal claim….A parent, alleging a violation of the IDEA, must first request an 'impartial due process hearing' that may be conducted by either the local school district or the State….If the initial review is performed by the school district and the parent is dissatisfied with its decision, the parent may appeal the decision to the State level.

*See also M.M. v. Sch. Dist. Of Greenville Cnty.*, 303 F.3d 523, 535 (4th Cir. 2002) ("It is clear that, under the IDEA, parents asserting a violation of the IDEA must first request a due process hearing."); *Learning Disabilities Ass'n v. Bd. of Educ. Of Baltimore Cnty.*, 837 F. Supp. 717, 722 (D. Md. 1993) ("'The philosophy of the [IDEA] is that a plaintiff must first exhaust the state administrative remedies provided under the Act, including the administrative appeals provisions, before bringing an action in federal court.'") (citation omitted; alteration in *Learning Disabilities*).

Plaintiffs concede that they failed to exhaust administrative remedies under the IDEA, but insist that they are excused from the exhaustion requirement because it would have been futile.  They explain that the "IDEA provides no remedy for special education students who are *victims* of violations of school disciplinary rules," and the administrative process "does not  have the authority to grant the Plaintiff money damages."  Opposition at 10-11 (emphasis in original).  *See also* Complaint ¶ 26 (stating that the "administrative process would be futile" and "the administrative process…is inadequate…given the relief sought here, i.e., money damages.").

To be sure, "parents need not exhaust IDEA's administrative remedies where the state or local agency's procedures would be inadequate or futile."  *Learning Disabilities*, 837 F. Supp. at 723.  But, "'[t]he burden of demonstrating that administrative procedures [should be excused]

falls on the party seeking to avoid them.'"  *Id*. (citation omitted).   As "'application of IDEA's statutory exhaustion requirement, and the exceptions to it, is predominantly a question of law,'" the court "is not required to find that Plaintiffs are entitled to an exemption simply because they so state in their complaint."  *Id*. (citation omitted).

As the Wrights note, there is no *specific* provision in the IDEA as to remedies "for special education students who are *victims* of violations of school disciplinary rules."  Opposition at 10 (emphasis in original).  Yet, the IDEA "provides a specific remedy for special education students who have *violated* school disciplinary rules."  *Id*. (Emphasis added).  This includes the "right to a manifestation hearing to determine whether the student's conduct was caused by or directly related to his disability, 20 U.S.C. § 1415(k)(1)(E); a right to an expedited appeal of the manifestation decision before an impartial hearing officer, 20 U.S.C. §§ 1415(k)(3), (k)(4)(B) & (f)(1)(A); and a right to appeal that decision before a state review officer, 20 U.S.C. § 1415(g)."  *Coleman v. Newburgh Enlarged City Sch. Dist.*, 503 F.3d 198, 209 (2d Cir. 2007).   But, plaintiffs overlook the statutory scheme that is available to aggrieved parents of disabled students who claim a violation of the IDEA.  Plaintiffs' contention as to the statutory scheme that governs student offenders does not demonstrate futility with respect to the statutory scheme available to protect disabled students.

Nor is there merit to the assertion that exhaustion would have been futile because the administrative process "does not have the authority to grant the Plaintiff money damages."  Opposition at 11.  The Fourth Circuit has unequivocally held "that [the] IDEA does not provide for compensatory or punitive damages…."  *Sellers,* 141 F. 3d at 525.  In *Sellers*, it said, *id.*:

> Tort-like damages are simply inconsistent with IDEA's statutory scheme.  The touchstone of a traditional tort-like remedy is redress for a broad range of harms "associated with personal injury, such as pain and suffering, emotional distress,

harm to reputation, or other consequential damages.". . .By contrast, the touchstone of IDEA is the actual provision of a free appropriate public education.

To advance this goal, IDEA provides a panoply of procedural rights to parents to ensure their involvement in decisions about their disabled child's education….

The purpose of these procedural mechanisms is to preserve the right to a free appropriate public education, not to provide a forum for tort-like claims of educational malpractice. . . .[T]he [Supreme] Court has never approved an award of compensatory or punitive damages under the IDEA for a violation of its requirements.

To my knowledge, the Fourth Circuit has not specifically addressed the question of whether plaintiffs may circumvent the IDEA's exhaustion requirement by making claims for money damages. But, constituent courts within this circuit, interpreting Fourth Circuit law, have held that they may not. *See, e.g., A.W. ex rel. Wilson v. Fairfax Cnty. Sch. Bd.*, 548 F. Supp. 2d 219, 223 (E.D. Va. 2008) ("reject[ing] Plaintiffs' position that the compensatory damages sought are unavailable under the IDEA, and they are therefore not bound by the exhaustion requirement."); *Sturm v. Bd. of Educ. of Kanawha Cnty.*, No. 06-0342, 2006 WL 1582359, *2 (S.D. W.Va. June 1, 2006) ("[I]t is clear that litigants cannot 'avoid the exhaustion requirement by simply asking for relief that administrative authorities [cannot] grant,' such as money damages.") (citation omitted); *Pullen v. Botetourt Cnty. Sch. Bd.*, No. 94-686, 1995 WL 738983, *3 (W.D. Va. Feb. 13, 1995) (characterizing as "spurious" the plaintiff's claim that his demand for damages exempted him from the IDEA's exhaustion requirement, explaining that, were the court to accept the argument, "any party could sidestep administrative procedures by simply drafting a civil complaint that requests monetary relief.").

Failure to exhaust also mandates dismissal of Count III. In their Memo, at 22, defendants express confusion, which the Court shares, regarding why plaintiffs invoke Title VII of the Civil Rights Act, which prohibits employment discrimination based on race, color, religion, sex and

national origin, as "there is no allegation that R.W. or his parents were employees of the Defendants." Defendants also note correctly: "It is well established that receipt of an adverse administrative decision is a jurisdictional prerequisite to filing a Title VII claim." *Id.* (citing *Jones v. Calvert Group, Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009) ("Before a plaintiff may file suit under Title VII…he is required to file a charge of discrimination with the EEOC."). As defendants observe, Memo at 23: "Plaintiffs fail to allege that they filed a charge of discrimination with the EEOC or the [Maryland Commission on Human Relations], or that they received a right-to-sue letter from either of those agencies. Plaintiffs therefore failed to exhaust their administrative remedies…."

In their Opposition, the Wrights did not assert that they exhausted their administrative remedies prior to bringing suit. Indeed, they did not even address their Title VII claim and, as I see it, they have abandoned it. *See Ferdinand–Davenport v. Children's Guild,* 742 F. Supp. 2d 772, 777 (D. Md. 2010) ("By her failure to respond to [defendant's] argument" in a motion to dismiss, "the plaintiff abandons [her] claim.").

In addition, Count III sets forth a claim under § 504 of the Rehabilitation Act, 29 U.S.C. § 794. Defendants assert: "[A]lthough a plaintiff generally is not required to exhaust administrative remedies before initiating an action under Section 504, there is such a requirement where, as here, the Section 504 claim is tied to an IDEA claim." Memo at 23.

The IDEA provides, 20 U.S.C. § 1415 (l) (emphasis added; alterations in original):

Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990 [42 U.S.C.A. § 12101 et seq.], *title V of the Rehabilitation Act of 1973* [29 U.S.C.A. § 791 et seq.], or other Federal laws protecting the rights of children with disabilities, *except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) shall be exhausted to the*

*same extent as would be required had the action been brought under this subchapter.*

Accordingly, the IDEA exhaustion requirements apply to a § 504 claim.   Therefore, plaintiffs were required to exhaust their administrative remedies under the IDEA before bringing a parallel claim under § 504.   *See N.T. v. Balt. City Bd. of Sch. Comm'rs*, No. JKB–11–356, 2011 WL 3747751, *2 (D. Md. Aug. 23, 2011) ("Most of [plaintiffs' § 504] allegations are within the scope of 20 U.S.C. § 1415 and, therefore, are subject to IDEA's exhaustion requirement.").   *See also S.E. v. Grant Cnty. Bd. of Educ.*, 544 F.3d 633, 641-42 (6th Cir. 2008) ("When a claim under [§ 504] involves public education, we must consider a provision in the Individuals with Disabilities Education Act (IDEA)."), *cert. denied*, 129 S.Ct. 2075 (2009).

Plaintiffs concede that they did not satisfy the exhaustion requirements of the IDEA, which apply to claims under § 504.   Nor did they address their § 504 claim in their Opposition.   Consequently, Count III must be dismissed for failure to exhaust administrative remedies.

### *Failure to State a Claim*

Plaintiffs' Complaint is also defective, and subject to dismissal, because counts I, II, III, and IV fail to state claims upon which relief can be granted.   I will address each count in turn.

### *Count I*

In Count I, plaintiffs assert a "Claim for Deprivation of Constitutional Rights under 42 U.S.C. § 1983, 20 U.S.C. § 1400."   Complaint at 14.   They allege that defendants' "pattern of customs, usages and practices, described herein, including being deliberately neglectful of the abusive and violent conduct, deprived R.W. of his federal and state rights to a [FAPE], under the color of state law, in violation of 42 U.S.C. § 1983 and [the] IDEA."   Complaint ¶ 34.

Arguably, in a generous construction of Count I, plaintiffs attempted to bring a stand-alone IDEA claim for the alleged denial of a FAPE, in addition to a § 1983 claim.   But, in their

Opposition, at 11, plaintiffs said, in the context of limitations: "Plaintiffs' claims are not 'IDEA' claims *per se*, but constitutional tort claims arising out of a deprivation of federally protected statutory right to a FAPE guaranteed under IDEA…." Such a claim is not viable in the Fourth Circuit.

In *Sellers*, 141 F.3d at 529, the Fourth Circuit rejected the contention that a § 1983 claim could be premised on violations of the IDEA. The Court reasoned: "Because IDEA provides a comprehensive remedial scheme for violations of its own requirements, we hold that parties may not sue under section 1983 for an IDEA violation." *Id.* The pleading of a "denial of a free appropriate public education or a violation of related procedural safeguards…amounts only to a violation of IDEA; indeed, Plaintiffs must plead 'a higher standard of liability' to allege a constitutional claim sufficiently—and properly invoke § 1983—at [the motion to dismiss] stage." *McNulty v. Bd. of Educ. of Calvert Cnty.*, No. DKC 03–2520, 2004 WL 1554401, *7 (D. Md. July 8, 2004) (quoting *Sellers,* 141 F.3d at 530). *See also Yancey v. New Baltimore City Bd. of Sch. Comm'rs*, 24 F. Supp. 2d 512, 514 n.1 (D. Md. 1998) ("Plaintiffs' § 1983 claim fails as a matter of law because an IDEA violation cannot form the basis of a § 1983 claim."). As plaintiffs allege no other "deprivation of any rights, privileges, or immunities secured by the Constitution and law," apart from the allegations as to the IDEA, they have failed to state a claim under § 1983. *See* 42 U.S.C. § 1983.

<u>*Count II*</u>

In Count II, plaintiffs lodge a claim under the IDEA based on 42 U.S.C. § 1985, which prohibits conspiracies to interfere with civil rights. Plaintiffs assert that defendants "individually and in concert with one another, deprived the Plaintiff, R.W., of his right to a [FAPE] under [the IDEA] by failing to impose discipline against the offending student, or—alternatively—

effectively imposing discipline against the victim…."  Complaint ¶ 40.

The elements of a § 1985 claim for conspiracy are as follows:

(1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy.

*Simmons v. Poe*, 47 F.3d 1370, 1376 (4th Cir. 1995).

As the Fourth Circuit has made clear, "to prove a section 1985 'conspiracy,' a claimant must show an agreement or a 'meeting of the minds' by defendants to violate the claimant's constitutional rights."  *Id.* at 1377.  Moreover, a conspiracy must be alleged with specificity and must describe "the time, place, and effect of the conspiracy, including the nature of the agreement and overt acts in furtherance of the conspiracy."  *Langworthy v. Dean*, 37 F. Supp. 2d 417, 424-425 (D. Md. 1999).  And, of import here, the Fourth Circuit has "specifically rejected section 1985 claims whenever the purported conspiracy is alleged in a merely conclusory manner, in the absence of concrete supporting facts."  *Simmons*, 47 F.3d at 1377.  Indeed, the Court "has rarely, if ever, found that a plaintiff has set forth sufficient facts to establish a section 1985 conspiracy…."  *Id.*

Defendants maintain that plaintiffs have not stated a claim for conspiracy.  They observe that "there is no allegation whatsoever that the Defendants entered into any type of agreement at all," Memo at 13, and claim that "it is a legal impossibility for a school board and its employees to engage in an intra-corporate conspiracy."  *Id.* at 14.  They also point out that the Complaint "does not allege that the Defendants 'deprive[d] the plaintiff[s] of the equal enjoyment of rights secured by the law to all.'"  *Id.* at 13 (citation omitted).

In a single sentence in their Opposition, plaintiffs summarily posit that they "have sufficiently alleged a claim under § 1985." Opposition at 9. They assert: "Plaintiffs specifically allege concerted action—that is, action by agreement and consent in interfering with the Plaintiff's pursuit of a [FAPE] in the least restrictive environment—by the Board actors, in effectively imposing discipline against the victim." *Id.*

In the first instance, it is unlikely that a violation of the IDEA can serve as the basis for a suit under 42 U.S.C. § 1985, given the Fourth Circuit's ruling in *Sellers*, 141 F.3d at 529, barring suit under § 1983 for an IDEA violation. *See B.D. ex rel. Dragomir v. Griggs*, No. 09-439, 2010 WL 2775841, *6 n.3 (W.D.N.C. July 13, 2010) ("Indeed, the comprehensive enforcement scheme of the IDEA shows that Congress intended to preclude claims pursuant to 42 U.S.C. §§ 1983 & 1985 for the violation of rights under the IDEA.") (citing *Sellers*, 141 F.3d at 529). Even assuming the viability of a claim under § 1985, however, plaintiffs have completely failed to set forth facts to support such a claim. Instead, they have baldly alleged that the defendants engaged in a conspiracy, without pleading *any* specific facts in support of the allegation. Their assertion in the Opposition that the harm sustained by plaintiffs somehow evinces a conspiracy is akin to the mere speculation that cannot suffice to state a viable claim under the *Twombly-Iqbal* landscape. *See Twombly,* 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level…"); *Iqbal,* 556 U.S. at 681 ("[T]he allegations are conclusory and not entitled to be assumed true.").

Moreover, defendants correctly assert that "it is a legal impossibility for a school board and its employees to engage in an intra-corporate conspiracy." Memo at 14. "The law is well-settled…that a conspiracy between a corporation and its agents, acting within the scope of their employment, is a legal impossibility." *Marmott v. Maryland Lumber Co.*, 807 F.2d 1180, 1184

(4th Cir. 1986), *cert. denied* 482 U.S. 929 (1987), *rehearing denied* 483 U.S. 1044 (1987).  And, "[t]he intracorporate conspiracy doctrine is equally applicable to governmental entities such as school districts."  *Larson by Larson v. Miller*, 76 F.3d 1446, 1456 n.6 (8th Cir. 1996).  *See, e.g., Hull v. Cuyahoga Valley Joint Vocational Sch. Dist.,* 926 F.2d 505, 510 (6th Cir. 1991) ("[P]laintiff is alleging a conspiracy between a school district superintendent, the executive director of the district, and a school administrator, all of whom are employees or agents of the Board.  Since all of the defendants are members of the same collective entity, there are not two separate 'people' to form a conspiracy."), *cert. denied*, *Hull v. Schuck,* 501 U.S. 1261 (1991); *Moody v. Jefferson Parish Sch. Bd.,* 803 F.Supp. 1158, 1166 (E.D. La. 1992) (rejecting claim that a school board employee, a high school principal and vice–principal, and various teachers conspired to interfere with the constitutional rights of plaintiff, a teacher, because all were employed by the school board and, "as a matter of law…constitute a single entity incapable of forming the alleged conspiracy."), *aff'd*, 2 F.3d 604 (5th Cir. 1993); *Michelin v. Jenkins*, 704 F. Supp. 1, 4 (D. D.C. 1989) ("[T]here can be no conspiracy between the. . .Board of Education and its officials to violate plaintiff's rights, since these defendants comprise a single entity, not capable of entering into a conspiracy.").

<u>*Count III*</u>

To the extent that Count III attempts to bring a Title VII claim, it wholly fails to do so. To be sure, "Title VII" appears in the caption.  But, as indicated, it is unclear why plaintiffs invoke Title VII, which prohibits discrimination in employment.  As defendants note in their Memo, at 22, "there is no allegation that R.W. or his parents were employees of the Defendants." Nor will inclusion of the statute in the caption suffice to state a cause of action under the statute.

Plaintiffs also seek to bring a claim under § 504 of the Rehabilitation Act, which prohibits discrimination against disabled persons.  They aver that defendants breached their duty of care to R.W. "by failing to ensure that [he] was not the victim of invidious discrimination by virtue of his disability…."  Complaint ¶ 44.

Section 504 provides: "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . ."  29 U.S.C. § 794(a).  The Fourth Circuit has "held that to establish a violation of section 504, plaintiffs must prove that they have been discriminated against—that they were 'excluded from the employment or benefit *due to discrimination* solely on the basis of the disability.'"  *Sellers*, 141 F.3d at 528 (quoting *Doe v. Univ. of Md. Med. Sys. Corp.,* 50 F.3d 1261, 1265 (4th Cir. 1995) (emphasis added in *Sellers*)).  The *Sellers* Court explained: "To prove discrimination in the education context, 'something more than a mere failure to provide the [FAPE] required by [IDEA] must be shown.'"  141 F.3d at 528 (citation omitted).  It also expressly agreed with those courts that have held "'that either bad faith or gross misjudgment should be shown before a § 504 violation can be made out, at least in the context of education of handicapped children.'"  *Id.* at 529 (citations omitted).

Defendants contend, Memo at 25, that the allegations in the Complaint "merely allege that the Defendants had a duty not to discriminate against R.W. on the basis of his disability, and that the Defendants breached that duty by failing to ensure that R.W. was not a victim by virtue of his disability."  Further, they maintain that it is not clear that R.W. was "a victim by virtue of his *disability*," *id.* (emphasis added), as the Complaint does not "allege that 'M.' bullied R.W. because of R.W.'s disability," as opposed to some other ground.  *Id.* at 26.  Moreover, they argue

that the Complaint is "devoid of the specificity required under *Twombley* [sic]," as "Plaintiffs do not identify which of the Defendants allegedly discriminated against R.W. or how such discrimination was accomplished." *Id*. Defendants also insist that plaintiffs do not "allege as required that the Defendants [acted] in bad faith or gross misjudgment." *Id*. at 25.

Plaintiffs counter that the Complaint "alleges facts sufficient to show bad faith, or—at a minimum—gross misjudgment by the Board and the Board actors." Opposition at 13. As evidence of these factors, plaintiffs refer to the initial refusal to permit Ms. Wright to observe at Carrolltowne, which "suggests concealment." *Id*. at 13-14. They also assert that "[t]he choice to inflict fear of judges on the child suggests patent retaliation." *Id*. at 14. According to plaintiffs, after they filed suit, unspecified "speech pathology instructional personnel," not identified in the suit, "terrorized" R.W., by showing his class "photographs of judicial personnel purportedly engaged in heated conversation with defendant or litigant subjects." Complaint ¶ 27.

As defendants observe, "there are any number of reasons why school administrators might have refused to permit Mrs. Wright to conduct intensive observations of R.W.'s classes immediately upon her request after R.W. was allegedly bullied." Reply at 18. In any event, it is undisputed that Ms. Wright was permitted to engage in an extensive observation period beginning on Monday, October 27, 2008, a mere two school days after the incident of Wednesday, October 22, 2008. Moreover, the alleged retaliatory conduct has no bearing on whether defendants acted in bad faith or with gross misjudgment *three years earlier*, when the alleged bullying of R.W. occurred.

Nor have plaintiffs addressed what, in my view, is an obvious defect in the Complaint: there is no allegation that R.W. was subject to discrimination *because of* his disability.

Plaintiffs' protestations that the Complaint adequately pleads "bad faith or gross misjudgment" are unpersuasive.

<em>Count IV</em>

In Count IV, plaintiffs assert a state law claim for "Common Law Gross Negligence." They allege that defendants breached their duty of care to R.W. "by failing to ensure he was not the victim of invidious and purposeful discrimination, even when they had specific, defining knowledge of the discriminatory bullying activity being visited upon him by the student perpetrator." Complaint ¶ 48.  According to plaintiffs, this conduct constitutes gross negligence because defendants "ha[d] specific knowledge of the incident" but "fail[ed] to act." *Id.* ¶ 50.  In urging dismissal of Count IV, defendants argue that the "allegations fall far short of stating a cause of action for gross negligence under Maryland law."  Memo at 27.[11]

*Taylor v. Harford County Department of Social Services*, 384 Md. 213, 862 A.2d 1026 (2004), is instructive.  There, the Maryland Court of Appeals described gross negligence as "'[a]n intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them.'"  *Id.*at 238, 862 A.2d at 1034 (citation and some internal quotation marks omitted).

*Foor v. Juvenile Services*, 78 Md. App. 151, 552 A.2d 947, *cert. denied* 316 Md. 364, 558 A.2d 1206 (1989), also provides guidance.  In that case, the Maryland Court of Special Appeals said, *id.* at 170, 552 A.2d at 956 (some internal quotation marks omitted):

---

[11] With respect to tort claims, Maryland applies the principle of *lex loci delicti*, *i.e.*, the law of the "place of the alleged harm," *Proctor v. Wash. Metro. Area Transit Auth.*, 412 Md. 691, 726, 990 A.2d 1048, 1068 (2010), which in this case is Maryland.  Thus, the Court will apply Maryland  law with respect to plaintiff's claim of gross negligence.  *See Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007)  (The court "must apply the substantive law of the forum state including its choice of law rules)."

In *Bannon v. B. & O. R.R. Co.,* 24 Md. 108, 124 (1866), the Court observed that "[g]ross negligence is a technical term: it is the omission of that care which even inattentive and thoughtless men never fail to take of their own property, it is a violation of good faith. . . .It implies malice and evil intention."

That standard has remained more or less intact. Gross negligence has been equated with "wilful and wanton misconduct," a "wanton or reckless disregard for human life or for the rights of others." *White v. King,* 244 Md. 348, 223 A.2d 763 (1966). In *Romanesk v. Rose,* 248 Md. 420, 423, 237 A.2d 12 (1968), the Court, quoting from 4 Blashfield, *Cyclopedia of Automobile Law and Practice* § 2771 (1946), held that "a wrongdoer is guilty of gross negligence or acts wantonly and willfully only when he inflicts injury intentionally or is so utterly indifferent to the rights of others that he acts as if such rights did not exist." *See also Liscombe v. Potomac Edison Co.,* 303 Md. 619, 495 A.2d 838 (1985). When dealing with such a standard, bald and conclusory allegations will not suffice; specificity is required. *Smith v. Gray Concrete Pipe Co.,* 267 Md. 149, 168, 297 A.2d 721 (1972); *Nast v. Lockett,* 312 Md. 343, 370, 539 A.2d 1113 (1988).

Plaintiffs insist that they have adequately alleged gross negligence, arguing: "Plaintiffs have pleaded deliberate indifference or neglect many times over." Opposition at 15. They argue that the Complaint contains "factual allegations [which] specify that the Board Defendants acted with specific knowledge of the inappropriateness of their conduct…." *Id.* at 16.

In my view, the Complaint is devoid of adequate "factual allegations." In a conclusory manner, plaintiffs allege that defendants, generally, were aware that their conduct was insufficient to protect R.W. But, the Complaint contains no facts to support that assertion, apart from the following: some Carrolltowne personnel were on notice that R.W. had "expressed fears of reporting to school," *id.* ¶ 16; in spite of Principal Ball's promise to Ms. Wright to address the situation, some Carrolltowne personnel were uninformed of the issue, *id.* ¶ 21; R.W. was "attacked" by 'M.' after Carrolltowne had been put on notice of R.W.'s "fears of reporting to school," *id.* ¶ 17; and, after the "attack," R.W. and M. were seated in class in "very close proximity" to each other. *Id.* ¶18.

A comparison to *Foor* is telling.   In that case, Maryland's Juvenile Services Administration ("JSA") and other institutional and individual defendants were accused of various tort claims.   Three JSA employees were sued on the ground that they knowingly placed a foster child who abused drugs with a family that had specified that "the only condition they had for participation in the [foster care] program was that no child with a drug problem, past or present, should be placed in their home."   78 Md. App. at 157, 552 A.2d at 950.   While under the influence of drugs, the foster child murdered the family's biological child.   The trial court dismissed the case for failure to state a claim.

On appeal, with respect to JSA, the Maryland Court of Special Appeals determined that the complaint stated a viable claim for negligence.   It opined, *id.* at 165-66, 552 A.2d at 954:

> The plaintiffs assert…that, as a condition to their participation in the foster care program, the Foors made clear to JSA that no child with a drug problem, past or present, was to be placed in their home.   They also aver that JSA agreed to that condition.   That, we think, suffices to charge a duty on the part of JSA to the Foors not to place such a child in their home.[] There can be little doubt that the complaint charges a breach of that duty. . . .

The Court continued, *id.* at 168-69, 552 A.2d at 955-56:

> It is reasonably foreseeable that a 15–or 16–year old child, sufficiently troubled to have a history of "criminal behavior which required his appearance before the Juvenile Court," who indeed had recently been placed in detention,[] and who has a "specific history of substance abuse, including the ingestion of PCP, amphetamines, LSD, cocaine, [and] qualudes" may continue to ingest drugs and may, as a result, become disruptive and assaultive if placed in a home without any warning to the family of the child's background and without the provision of adequate follow-up support services.[] Any reasonably sensible lay person, much less anyone purporting to have the qualifications to work in a professional capacity for the Juvenile Services Administration, could anticipate that much.

However, the Court determined that these facts did *not* amount to gross negligence on the part of the three individual JSA defendants, such that they would be deprived of governmental immunity.   After reciting the standard for gross negligence, discussed *supra*, the Court concluded

that the complaint was "woefully lacking" in the requisite "specificity" to suggest that the employees "inflict[ed] injury intentionally" or were "utterly indifferent to the rights" of plaintiffs, *id.* at 170, 552 A.2d at 956, nor had plaintiffs alleged "anything that would constitute malice on the part of the three employees." *Id.* at 169, 552 A.2d at 956.  Rather, the plaintiffs had merely "throw[n] in the term 'gross negligence,'" which the Maryland court determined was "not enough." *Id.* at 170, 552 A.2d at 956.

*Wells v. State*, 100 Md. App. 693, 642 A.2d 879, *cert. denied,* 336 Md. 560, 649 A.2d 602 (1994), is also instructive.   There, the defendants, employees of the Baltimore City Department of Social Services and Maryland's Department of Human Resources, allegedly committed various torts in connection with the beatings of two children, one of whom died as a result of her injuries.  Plaintiff, the surviving child, alleged that defendants took no action to protect the children, although they had received repeated reports that plaintiff's mother and her boyfriend subjected plaintiff and his deceased sister to abuse so horrific that, as Chief Judge Wilner noted, the complaint was "not easy to read with any substantial degree of emotional detachment." *Id.* at 698, 642 A.2d at 881.  The trial court dismissed the complaint for "various reasons" not specified by the appellate court.

On appeal, the court was asked to consider whether plaintiff/appellant had adequately pled gross negligence against the individual defendants.  The court concluded that plaintiff "failed, completely, to allege the kind of wanton, wilful, or reckless conduct on the part of the[] supervisory defendants…necessary to sustain an action for gross negligence." *Id.* at 704, 642 A.2d at 884.  In its view, *id.* at 705-06, 642 A.2d at 885, the defendants' actions

> suggest individual negligence and bureaucratic mismanagement and incompetence; they suggest a critically important governmental unit not properly doing its job because of underfunding, understaffing, lack of effective leadership and supervision, lack of training, and lack of clear procedures and protocols.

They do not indicate, however, malice, evil intention, or wanton, wilful, or reckless disregard for human life or the rights of others. In short, they do not allege gross negligence on the part of any of the defendants.

I agree with defendants that "there is absolutely nothing in the Amended Complaint that comes remotely close to alleging facts that would rise to the level of 'malice, evil intention, or wanton, willful, or reckless disregard' of R.W.'s rights sufficient to state a cause of action for gross negligence." Memo at 30 (citation omitted). Therefore, I will dismiss Count IV.

*Defendants Seidel, Shreeve, Bauer, Foley, and Harrison*

Defendants observe, Memo at 7:

> [T]here is not a single reference to any action or inaction on the part of any of the Board members by name (*i.e.*, Seidel, Shreeve, Bauer, Foley, or Harrison), nor is there any reference whatsoever to Superintendent Stephen H. Guthrie, who was not Superintendent at the time of the allegations, or Director of Special Education Russell S. Gray, whom, it should be noted, was not even an employee of the Board at the time of the allegations made in the Complaint.

In their Opposition, at 7, plaintiffs seem to argue that the lack of particularized allegations is acceptable because they are proceeding under a "*Monell*" theory of supervisory liability. *See Monell v. New York City Dept. of Soc. Svcs.*, 436 U.S. 658 (1978). But, *Monell* liability attaches in the event of a constitutional violation, and the First Amended Complaint states no viable constitutional claims.[12] Plaintiffs' complete failure to assert some factual basis for attributing liability to the particular defendants named above is yet another ground to support dismissal as to them.

## Conclusion

---

[12] In their Opposition, plaintiffs do not respond to defendants' argument that the Board is a state agency, and its members, when acting in their official capacities, are state actors such that they are not "'persons' subject to suit for damages under 42 U.S.C. §§ 1983 or 1985." Memo at 10. The Court assumes that the point stands conceded. *See Ferdinand–Davenport, supra,* 742 F. Supp. 2d at 777 ("By her failure to respond to [defendant's] argument" in a motion to dismiss, "the plaintiff abandons [her] claim.").

Having found that all of plaintiffs' claims should be dismissed for the reasons stated, I need not resolve defendants' contentions regarding the viability of various claims against particular defendants; the defense of statute of limitations; or defendants' contention that they are protected by statutory and qualified immunity.  If plaintiffs file another amended complaint, defendants will be entitled to renew these contentions.

It should be noted, however, that to the extent that a three year statute of limitations applies to plaintiffs' claims,[13] the claims are not time barred on the face of the Complaint. Defendants rely on plaintiffs' assertion in their Complaint, at ¶ 21, in which plaintiffs aver: "During the three-day observation period, from October 27-29, 2008, Mrs. Wright had the opportunity to have face to face conversations with many of R.W.'s teachers….At this point, it became clear to Mrs. Wright that school administration had not exercised any specific control over the circumstance, had failed to adequately train teachers and other instructional staff, appearing deliberately indifferent to the attacks."  As suit was filed on October 31, 2011, defendants conclude that, "by their own admission, Plaintiffs filed their Verified Complaint more than three years after they discovered the alleged wrongs allegedly perpetrated upon R.W." Memo at 6.

In the light most favorable to plaintiffs, the Complaint does not specify the particular day that Ms. Wright discovered the alleged wrong.  Common sense dictates that it was likely a gradual realization, rather than a magical moment of understanding that can be pin-pointed with precision.  Moreover, if the discovery occurred on October 29, 2008, then plaintiffs would have had until October 29, 2011, to file suit.  However, because October 29, 2011, fell on a Saturday,

---

[13] Defendants fail to explain why they apply a three year statute of limitations to all four of plaintiffs' claims.  At least some of plaintiffs' claims have limitations periods that run from the date of exhaustion.

the filing deadline was extended to Monday, October 31, 2011, the date on which suit was filed.

*See* Fed. R. Civ. P. 6(a)(1)(C) ("if the last day [of a period] is a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday."); Maryland Rule 1-203(a)(1) (if the last day of a period "is a Saturday, Sunday, or holiday,…the period runs until the end of the next day that is not a Saturday, Sunday, or holiday").

A separate Order follows.


Date: May 24, 2012                                         _____/s/_____
                                                          Ellen Lipton Hollander
                                                          United States District Judge