IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

RICHARD A. WRIGHT, et al.,

    *Plaintiffs,*

    v.

CARROLL COUNTY BOARD OF
EDUCATION, et al.,

    *Defendants.*

Civil Action No.: 11-cv-3103

**MEMORANDUM OPINION**

Plaintiffs Richard A. Wright and Amy M. Wright (the "Wrights"), as parents and next friends of R.W., their minor child, have filed suit with respect to the alleged bullying of their "special needs" son in the fall of 2008, when he was a fifth grade student at Carrolltowne Elementary School ("Carrolltowne") in Sykesville, Maryland.[1] The Second Amended Complaint ("S.A.C.", ECF 22) asserts violations of various federal statutes and claims under Maryland law,[2] and names a host of defendants, in their individual and official capacities. They are: the Carroll County Board of Education (the "Board"); Jennifer A. Seidel, President of the Board; Barbara J. Shreeve, Vice President of the Board; Gary W. Bauer, Cynthia L. Foley, and Virginia R. Harrison, members of the Board; Steven H. Guthrie, Superintendent of the Carroll County Public School System (the "School System"); Curtis T. Schnorr, Director of Elementary Education for

---

[1] The First Amended Complaint and, to a lesser extent, the Second Amended Complaint are replete with angry, highly charged, and bald accusations concerning exploitation, subversion, and corruption of the "administrative process" and the protection of school officials at the expense of the students they serve. To be sure, contemporary problems such as bullying and teen suicide are serious societal issues. But, this case is about R.W. and the school system's response to his particular situation, as well as the requirements of the law.

[2] This Court has federal question jurisdiction as to plaintiffs' claims arising under federal statutes, pursuant to 28 U.S.C. § 1331. In addition, the Court has supplemental jurisdiction as to plaintiffs' state law claims, pursuant to 28 U.S.C. § 1367.

the Board; Russell S. Gray, Director of Special Education at Carrolltowne; Terry Ball, Principal of Carrolltowne; Shavon T. Showers, Assistant Principal of Carrolltowne; Michelle Fliegel, R.W.'s teacher at Carrolltowne; Linda Barton, an "instructional specialist" for the Board; a Jane Doe defendant, identified as a speech therapist (collectively, the "Carroll County Defendants"). In addition, plaintiffs have sued Rochelle S. Eisenberg, Esq. and Andrew G. Scott, Esq., who served as the Board's legal counsel during the relevant time, and their law firm, Pessin Katz Law, P.A. ("Pessin Katz") (collectively, the "Pessin Katz Defendants"). Plaintiffs seek both compensatory and punitive damages and unspecified injunctive relief.

On May 24, 2012, I dismissed plaintiffs' First Amended Complaint ("F.A.C.," ECF 7), without prejudice and with leave to amend. *See* Memorandum Opinion ("Mem. Op.," ECF 20) & Order (ECF 21). Thereafter, plaintiffs filed the Second Amended Complaint, which is at issue here. It contains five counts, four of which are largely the same as the four counts contained in the First Amended Complaint.[3]

Count I again presents a "Claim for Deprivation of Constitutional Rights" under 42 U.S.C. § 1983 and the Individuals With Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, lodged against the Carroll County Defendants. In particular, plaintiffs assert that R.W. is "entitled to equal protection of the law while a student" at Carrolltowne, "bodily integrity and the freedom from ongoing threat of assault,"[4] a free appropriate public education ("FAPE"), and an Individualized Education Plan ("IEP"), "without the requirement that his parents procure the assistance and bear the expense of an attorney." S.A.C. ¶ 41. The Wrights further allege that the

---

[3] The four counts of the First Amended Complaint were misnumbered as Count I, Count II, Count IV, and Count V. Because the parties referred to Count IV as Count III, and Count V as Count IV, I did the same. *See* Mem. Op. at 2 n.2.

[4] As noted, *infra*, the allegations as to "equal protection" and "bodily integrity" appear to be vestiges of plaintiffs' Fourteenth Amendment equal protection and due process claims, which they have abandoned.

Carroll County Defendants' "pattern of customs, usages and practices . . . including being deliberately neglectful of the abusive and violent conduct, deprived R.W. of his federal and state rights to a free appropriate public education, under the color of state law, in violation of 42 U.S.C. § 1983 and [the] IDEA." S.A.C. ¶ 45. Further, they claim that Ball and the Board "failed to adequately train and supervise teacher staff in . . . techniques to defuse bullying." *Id.* ¶ 46.

In Count II, plaintiffs renew their "Claim for Deprivation of Constitutional Rights" under 42 U.S.C. § 1985 and the IDEA, claiming that the Carroll County Defendants, "individually and in concert with one another, deprived the Plaintiff, R.W., of his right to a [FAPE] under [the IDEA] by failing to impose discipline against" a student who "bullied" R.W., and, instead, "effectively imposing discipline against [R.W.]" S.A.C. ¶ 50.

Count III presents claims under Title II of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.[5] In Count III, plaintiffs renew their claim that the Carroll County Defendants "fail[ed] to ensure that R.W. was not the victim of invidious discrimination by virtue of his disability, and . . . by making him bear the educational consequence by regressing him a grade level when that action clearly was not merited by his educational achievement." S.A.C. ¶ 54. They have added an allegation that the Carroll County Defendants "retaliated" against R.W. for "asserting his disability rights." *Id.* ¶ 56. In particular, they allege that R.W.'s "speech therapy instructor, Jane Doe . . . exposed R.W. to photographs tending to portray members of the judiciary as hostile to students, for the express purpose of frightening him." *Id.*

---

[5] In Count III of the First Amended Complaint, plaintiffs asserted a "Violation of *Title VII* [and] § 504 of the Rehabilitation Act of 1973." F.A.C. at 22 (emphasis added). Plaintiffs' counsel now states that he "merely committed a typographical error, inserting 'Title VII' rather than 'Title II of [the] ADA.'" S.A.C. ¶ 20 n.2. As a result of that error, however, the Court needlessly addressed what it thought was a Title VII claim.

In Count IV, the only new claim added to the Second Amended Complaint, plaintiffs assert violations of Title II of the ADA and Section 504 of the Rehabilitation Act against the Pessin Katz Defendants. Plaintiffs allege that on February 15, 2012, after R.W. was placed at a new school, defendants Eisenberg, Scott, and Pessin Katz attended the educational meeting between plaintiffs and the Board, for the "purpose of creating an adversarial atmosphere," to "frustrate" the meeting and to "threat[en]" R.W.'s "compromised physical, mental and emotional state." *Id.* ¶ 58. In plaintiffs' view, the presence of the lawyers at R.W.'s new school was "reprehensible." *Id.* They also claim that Pessin Katz is liable for the acts of Scott and Eisenberg under a theory of respondeat superior. *Id.* ¶ 17.

Count V again presents a claim for "Common Law Gross Negligence," alleging that defendants breached their duty of care to R.W. "by failing to ensure he was not the victim of invidious and purposeful discrimination," despite "knowledge of the discriminatory bullying activity being visited upon him by the student perpetrator." *Id.* ¶ 61. Plaintiffs have added an allegation that defendants' "retaliated" against R.W. with "reckless indifference or actual malice." *Id.* ¶ 62.

Pursuant to Fed. R. Civ. P. 12(b)(6), the Carroll County Defendants and the Pessin Katz Defendants have moved to dismiss for failure to state a claim. *See* ECF 43 ("Pessin Katz Motion"); ECF 44 ("Carroll County Motion"). They also filed supporting memoranda. *See* ECF 43-1 ("Pessin Katz Memo"); ECF 44-1 ("Carroll County Memo"). Additionally, the Carroll County Defendants incorporated by reference the arguments made in their memorandum in support of their motion to dismiss the First Amended Complaint (ECF 11-1).

Plaintiffs oppose the Carroll County Motion ("Opposition" or "Opp.," ECF 49-1),[6] incorporating, by reference, the arguments made in their opposition to the Carroll County Defendants' motion to dismiss the First Amended Complaint (ECF 14). Plaintiffs have not opposed the Pessin Katz Motion. Instead, they have moved to disqualify counsel for the Pessin Katz Defendants and also moved to strike the Pessin Katz Motion (collectively, ECF 45), which they have supported with a memorandum (ECF 47). The Pessin Katz Defendants oppose the motion to disqualify as well as the motion to strike ("Pessin Katz Opp.," ECF 50).

No hearing is necessary to resolve the motions. *See* Local Rule 105.6. For the reasons that follow, I will deny plaintiffs' motion to disqualify and their motion to strike, and I will grant the defendants' motions to dismiss, with prejudice.

### Factual and Procedural Background

The facts alleged in the Second Amended Complaint are largely identical to those alleged in the First Amended Complaint, which I recounted in the Memorandum Opinion of May 24, 2012. *See* ECF 20. However, for convenience, I will revisit the pertinent factual allegations, construing them in the light most favorable to plaintiffs. *See Philips v. Pitt Cnty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

R.W. was born in May 1997. S.A.C. ¶ 1. He is "a special needs child, suffering from the developmental disorder known as autism." *Id.* ¶ 20. In September 2008, R.W. was a fifth grade student at Carrolltowne, and "was on an educational track to graduate from elementary school to middle school." *Id.* As early as September 2, 2008, and during late September and early October 2008, his mother, Ms. Wright, told R.W.'s teacher, Ms. Fliegel, and several other

---

[6] Plaintiffs' counsel mistakenly omitted a memorandum of law in support of plaintiffs' initial opposition, which was filed on October 31, 2012 (ECF 46). Plaintiffs did not file a supporting memorandum of law until November 19, 2012 (ECF 49-1). Thereafter, the Carroll County Defendants replied ("Carroll County Reply," ECF 51).

unidentified "school officials" and "staff," about R.W.'s "fear" of "M.," a "male peer," and his "fears of reporting to school." *Id.* ¶ 21. Ms. Ball, the Principal of Carrolltowne, assured Ms. Wright "that the situation was viewed with appropriate gravity and would be dealt with appropriately." *Id.* Nevertheless, R.W. endured cruel and "serious episodes of student-on-student violence" inflicted by M., including being "stabbed at or struck with pencils, being pushed and punched, [and] being ridiculed for the affect and mannerisms which are the effect of his disability." *Id.* ¶ 23.

As a result of M.'s conduct, R.W. became "extremely school avoidant." *Id.* ¶ 21. Then, on or about October 22, 2008, M. "attacked" R.W. at school, and also "threatened," "taunted," "ridiculed," and "assaulted" R.W. *Id.* Plaintiffs maintain that M. attacked R.W. because of his "affect and disability." *Id.* Ms. Showers, Carrolltowne's Assistant Principal, summoned Ms. Wright to school on October 22, 2008, where Ms. Wright observed that R.W. had "withdrawn into a tightly wound fetal position." *Id.* ¶ 22. In addition, "both of his eyes were blackened and his lower lip was swollen." *Id.*

In response to the events of October 22, 2008, Ms. Wright contacted Curtis Schnorr, Director of Elementary Education for the Board, and arranged "a three-day period of observation at R.W.'s classes from October 27-29, 2008." *Id.* ¶ 23. During her visit, Ms. Wright spoke with many of R.W.'s teachers. To Ms. Wright's dismay, "several of [them] indicated that they had no specific information about the bullying attacks visited upon R.W. by M. from members of [the] school administration." *Id.* ¶¶ 23, 26. Ms. Wright also observed that R.W. was seated in the classroom in "very close proximity" to M. *Id.* ¶ 23. At that time, "it became clear to Mrs. Wright that school administration had not exercised any specific control over the circumstance [and] had failed to adequately train teachers and other instructional staff." *Id.* ¶ 26.

Plaintiffs vaguely assert that "further incidents" occurred on October 28, 2008, "and on other occasions both prior to and subsequent to these." *Id.* ¶ 21. However, unlike the incident of October 22, 2008, none of the other incidents are detailed in the Second Amended Complaint.

Subsequent to the incident of October 22, 2008, but at an unspecified time, school officials "placed [R.W.] in a lower grade level," which took him "off the 'graduation' academic track." *Id.* ¶ 24. According to plaintiffs, R.W. "was not afforded the opportunity to pursue his education" at Carrolltowne "in the least restrictive environment." *Id.* Moreover, he required treatment with a psychiatrist and a licensed clinical social worker, both of whom diagnosed R.W. with post-traumatic stress disorder ("PTSD"). *Id.* ¶ 25. As an alleged consequence of the PTSD, R.W. suffers from "a debilitating ancillary condition known as rectal prolapse . . . ." *Id.*

"As a result of the repetitive nature of the attacks, R.W. became extremely afraid to attend school . . . ." *Id.* ¶ 25. He was unable to return to a "school environment" without "becoming extremely anxious, to the point of him becoming physically ill." *Id.* ¶ 26. Therefore, R.W. did not return to Carrolltowne after the 2008 Thanksgiving holiday. *Id.* Instead, he "received home services" for the remainder of the 2008-2009 school year. *Id.* After the Wrights withdrew R.W. from Carrolltowne, they retained counsel and commenced "the administrative process of procuring a modified Individual Education Plan ['IEP'] for R.W., with the goal of placing him somewhere" other than Carrolltowne. *Id.* ¶ 27. After about two years, *id.*, R.W. was "eventually" granted "the necessary out-placement at the Harbour School he requires," but not until his parents had spent thousands of dollars in attorney's fees," substantial sums for R.W.'s medical care, and "lost time from work . . . ." *Id.* at 4.[7]

---

[7] It is unclear when R.W. was placed at the Harbour School.

In the Second Amended Complaint, plaintiffs renew their claim that, since commencement of this suit, "Carroll County Board of Education speech pathology instructional personnel have terrorized [R.W.], by asking him to discuss in his speech pathology class photographs of judicial personnel purportedly engaged in heated conversation with defendant or litigant subjects," which plaintiffs insist is "designed specifically to frighten or terrorize [R.W.] with the prospect of having to testify at trial" in this case. *Id.* ¶ 38.

Plaintiffs allege that they "availed themselves of [the] administrative process" and "expressed interest in . . . a due process hearing." *Id.* at 4. But, they claim that school officials "discouraged the contentious process of an administrative hearing," and "eventually" granted R.W. an out-placement at the Harbour School. *Id.* Plaintiffs claim that further pursuit of administrative remedies under the IDEA is not required prior to litigating their claims, because the process would be "futile" and "counter-productive." *Id.* at 4 & ¶ 37. In particular, they claim that the administrative process is "part of a strategy designed to retaliate[,] . . . inflicting further damage on the child," so as to relieve plaintiffs of any requirement that they avail themselves of it. *Id.* at 4; *see also id.* ¶ 37.

The Second Amended Complaint also adds allegations concerning a meeting held on February 15, 2012, at the Harbour School to discuss R.W.'s IEP, which took place after this lawsuit was filed. *See id.* ¶¶ 28-33. Plaintiffs allege that, in addition to themselves and R.W., the meeting "was to include . . . Linda Barton, the school district's Instructional Specialist for special education outplacements, members of Harbour School administration and instructional staff." *Id.* ¶ 28. Plaintiffs aver: "Specifically excluded from the meeting were to be respective legal counsel for both the Plaintiffs and the Board of Education." *Id.* ¶ 29. Yet, defendants

Eisenberg and Scott, counsel for the Board, "ambushed" the plaintiffs and attended portions of the meeting, over plaintiffs' repeated objections. *Id.* ¶¶ 30-32.

At the conclusion of the meeting, plaintiffs "observed Ms. Eisenberg making statements in close proximity to or directed toward R.W." *Id.* ¶ 32. Eisenberg then "asked Harbour School officials for permission to tour the building," which, "[o]n information, Plaintiff[s] believe[] . . . was to seek out their child to approach and frighten him, to create emotional perturbation, fear, and anxiety." *Id.* According to plaintiffs, Barton "made false statements to justify" the presence of the Board's attorneys, claiming "that there were other meetings scheduled, when—in fact— there were none." *Id.* After the meeting, "R.W. became extremely distressed and anxious" that he would be followed and harassed by Eisenberg and Scott, "inject[ing] fear into his new educational circumstance." *Id.* ¶ 33. Since this meeting, R.W. has been in treatment for the "distressing effects" of the encounters. *Id.*[8]

Plaintiffs allege that they have incurred over $14,000 in attorney's fees to navigate the administrative process to obtain the IEP and R.W.'s out-placement; about $6,000 in medical expenses for R.W.; and approximately $26,000 in time lost from work to attend IEP meetings, mental health treatment for R.W., and the like. *See id.* ¶¶ 34-36.

### Standard of Review

A defendant may test the adequacy of a complaint by way of a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2008); *see Aschroft v. Iqbal*, 556 U.S.

---

[8] As an exhibit to their Second Amended Complaint, plaintiffs filed an affidavit of Erich Bonny, LCSW – C, a licensed clinical social worker who has treated R.W. since early 2009. *See* S.A.C. Exh. A (ECF 22-2). She attested to R.W.'s distress and anxiety. *See id.*

662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ." (citation omitted)); *see also Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011).

Whether a complaint adequately states a claim for relief is judged by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). *See Twombly*, 550 U.S. at 555. Rule 8(a)(2) provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Although the plaintiff need not include "detailed factual allegations," the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555. To satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Id.* at 556 (brackets in original) (internal quotation marks omitted). A complaint is insufficient if it provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Id.* at 555.

In considering a Rule 12(b)(6) motion, the court "'must accept as true all of the factual allegations contained in the complaint,'" and must "'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see, e.g.*, *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir.), *cert. denied* ___ U.S. ____, 132 S. Ct. 402 (2011). Moreover, a court "is not to consider matters outside the pleadings or resolve factual disputes . . . ." *Bosiger v. U.S. Airways, Inc.*, 510 F.3d 442, 450 (4th Cir. 2007). However, the court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Monroe v. City of Charlottesville, Va.*, 579 F.3d 380, 385-86 (4th Cir. 2009). If the "well-pleaded facts do

not permit the court to infer more than the mere possibility of misconduct," the complaint has not shown that "'the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (citation omitted); *see Brockington v. Boykins*, 637 F.3d 503, 505-06 (4th Cir. 2011) (recognizing that "dismissal is inappropriate unless, accepting as true the well-pled facts in the complaint and viewing them in the light most favorable to the plaintiff, the plaintiff is unable to 'state a claim to relief that is plausible on its face.'") (Citation omitted).

Typically, a motion pursuant to Rule 12(b)(6) "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999) (internal quotation marks omitted). But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint," the court may resolve the applicability of a defense by way of a Rule 12(b)(6) motion. *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007). "This principle only applies, however, if all facts necessary to the affirmative defense '*clearly appear*[ ] *on the face of the complaint*,'" or in other documents that are proper subjects of consideration under Rule 12(b)(6). *Id.* (quoting *Richmond, Fredericksburg & Potomac R.R. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993)) (emphasis in *Goodman*).

## Discussion

### A. Motion to Disqualify

Plaintiffs have moved to disqualify counsel for the Pessin Katz Defendants and to strike the Pessin Katz Motion. I will deny both motions.

On August 28, 2012, I held a telephone conference with counsel for the parties to discuss the posture of this case. *See* Letter to Counsel, Aug. 28, 2012 (ECF 37). At that time, plaintiffs' counsel indicated that he was considering filing a motion to disqualify Edmund J. O'Meally,

Esq., counsel for the Pessin Katz Defendants. *See id.* ¶ 1. Following the telephone conference, I wrote to counsel and said: "[I]f Mr. Sweitzer [plaintiffs' counsel] intends to pursue [a motion to disqualify], I ask that he file a motion to disqualify no later than October 1, 2012." *Id.* ¶ 1. Plaintiffs' counsel failed to do so. Indeed, plaintiffs did not file their motion to disqualify (which also included their motion to strike) until October 31, 2012, one month after the deadline, and without seeking an extension of time. *See* Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent."). Moreover, plaintiffs' counsel never offered any explanation for his delay. Had plaintiffs "harbored serious concerns" over defense counsel's alleged conflict, they "could and should have filed a motion to disqualify promptly." *Gross v. SES Americom, Inc.*, 307 F. Supp. 2d 719, 724 (D. Md. 2004).

Notably, even when the motion was filed, plaintiffs did not move to disqualify O'Meally. Instead, the motion was aimed solely at "opposing Counsel Andrew G. Scott," claiming he "proposes to represent a party Defendant member of his own law firm, Ms. Eisenberg, as well as the firm itself." Motion to Disqualify at 1. (*See* ECF 45, 47). However, Scott does not represent and has never represented the Pessin Katz Defendants. Rather, he represented the Carroll County Defendants, but withdrew as their counsel in September 2012. *See* ECF 39. And, Scott is now a defendant. During the telephone conference on August 28, 2012, plaintiffs' counsel represented that he would file a motion of voluntary dismissal as to Scott. *See* Letter to Counsel, Aug. 28, 2012, ¶ 4 (ECF 37). No such motion was filed, however.

Therefore, without suggesting that there is any merit to the motion to disqualify, I will deny it as moot. I will also deny the motion to strike, as it is predicated entirely on the disqualification of Scott as counsel for the Pessin Katz Defendants.

### B. Motions to Dismiss

1. <u>Count I</u>

In Count I, lodged against the Carroll County Defendants, plaintiffs assert a "Claim for Deprivation of Constitutional Rights under 42 U.S.C. § 1983, 20 U.S.C. § 1400." S.A.C. at 19. They allege that the Carroll County Defendants' "pattern of customs, usages and practices . . . including being deliberately neglectful of the abusive and violent conduct, deprived R.W. of his federal and state rights to a free appropriate public education, under the color of state law, in violation of 42 U.S.C. § 1983 and IDEA." S.A.C. ¶ 45. Plaintiffs appear to base Count I on the following aspects of R.W.'s experience at Carrolltowne.

First, plaintiffs describe various actions and inactions by the Carroll County Defendants, which they allege resulted in R.W.'s exposure to "student on student violence." S.A.C. ¶¶ 42-43. In particular, plaintiffs claim that certain Carroll County Defendants, including "Fliegel, Showers, Ball, Schnorr, and others . . . knew of some or all of the violent conduct . . . and represented, either directly or constructively, that they would take proper action to prevent it," but "failed" to do so. *Id.* ¶ 44. Additionally, plaintiffs allege that "Ball and the Defendant Board failed to adequately train and supervise teacher staff . . . in appropriate or necessary techniques to defuse bullying situations" at Carrolltown, and "failed to provide services to educate R.W. on how to deal with these incidents at school." *Id.* ¶ 46.

Second, plaintiffs contend that the Carroll County Defendants violated IDEA because they failed to respond to the bullying in a way that preserved R.W.'s right to a FAPE. Among other things, plaintiffs allege that the Carroll County Defendants moved R.W. to a lower class grade and took him off the graduation track, which prevented R.W. from pursuing his education by the "least restrictive means." *Id.* ¶ 41.

Notably, plaintiffs do not seek any particular injunctive relief as to R.W.'s educational placement. They concede in their Second Amended Complaint that "[s]chool district officials . . . eventually grant[ed] [R.W.] the necessary out-placement at the Harbour School he requires." *Id.* at 4. Rather, they seek compensatory damages for, *inter alia*, medical expenses incurred in regard to R.W.'s post-traumatic stress disorder, anxiety, depression, and school-related fears; attorney's fees; and time lost from work. *See id.* at 22-23.

In regard to the First Amended Complaint, I determined that plaintiffs' failure to exhaust administrative remedies under the IDEA precluded these claims. I also explained that, under clearly established Fourth Circuit precedent, plaintiffs could not lodge a claim under § 1983 predicated on an IDEA violation. Plaintiffs' Second Amended Complaint has offered no reason to depart from my prior rulings.

*i. IDEA*[9]

"Congress enacted IDEA in 1970 to ensure that all children with disabilities are provided 'a free appropriate public education which emphasizes special education and related services designed to meet their unique needs [and] to assure that the rights of [such] children and their parents or guardians are protected.'" *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239 (2009) (citation and internal footnote omitted) (alterations in *Forest Grove*); *see Sellers v. Sch. Bd. of City of Manassas*, 141 F.3d 524, 527 (4th Cir.) ("[T]he touchstone of IDEA is the actual provision of a free appropriate public education."), *cert. denied*, 525 U.S. 871 (1998).

To this end, IDEA mandates that "all states receiving federal funds for education must provide disabled schoolchildren with a 'free appropriate public education,'" commonly referred

---

[9] The IDEA "was enacted as the Education of the Handicapped Act, and was renamed the Individuals with Disabilities Education Act in 1990." *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239 n.6 (2009).

to as a "FAPE." *J.P. ex rel. Peterson v. Cnty. Sch. Bd. of Hanover Cnty., Va.*, 516 F.3d 254, 257 (4th Cir. 2008). In 20 U.S.C. § 1401(9), IDEA defines "free appropriate public education" as:

> [S]pecial education and related services that—
>
> (A) have been provided at public expense, under public supervision and direction, and without charge;
>
> (B) meet the standards of the State educational agency;
>
> (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
>
> (D) are provided in conformity with the individualized education program. . . .

"A school provides a FAPE by developing an IEP for each disabled child." *J.P.*, 516 F.3d at 257. The IEP consists of "a written statement for each child with a disability," 20 U.S.C. § 1414(d)(1)(A)(i), which "'must contain statements concerning a disabled child's level of functioning, set forth measurable annual achievement goals, describe the services to be provided, and establish objective criteria for evaluating the child's progress.'" *J.P.*, 516 F.3d at 257 (citation omitted). An IEP should be "'reasonably calculated to enable the child to receive educational benefits.'" *Id.* (quoting *Bd. of Educ. of Hendrick Hudson Central Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 207 (1982)). Additionally, "[t]o the maximum extent appropriate," an IEP should provide for a disabled child's education in the "[l]east restrictive environment," such as educating the child with non-disabled children in the "regular educational environment." 20 U.S.C. § 1412(a)(5)(A); *see A.B. ex rel. D.B. v. Lawson*, 354 F.3d 315, 330 (4th Cir. 2004) (discussing "least restrictive" education requirement).

To "advance" its objective, "IDEA provides a panoply of procedural rights to parents to ensure their involvement in decisions about their disabled child's education." *Sellers*, 141 F.3d

at 527.  In *Sellers*, the Fourth Circuit surveyed the procedural backbone of IDEA, stating, *id.* (internal citations omitted):[10]

> [P]arents may examine all relevant records relating to their disabled child's identification, evaluation, placement, and receipt of a free appropriate public education.  [*See* 20 U.S.C. § 1415(b)(1)].  They must receive written notice prior to changes in the child's identification, evaluation, placement, or receipt of a free appropriate public education.  [*See id.* § 1415(b)(3)].  They also may present complaints with respect to such matters.  [*See id.* § 1415(b)(6)].  They can air these complaints in an "impartial due process hearing," [*id.* § 1415(f)], and, in some cases, can appeal the findings and decision rendered in that hearing.  [*See id.* § 1415(g)].  Finally, a party aggrieved by the findings or decision of a hearing officer may seek judicial review.  [*See id.* § 1415(i)(2)].

Through these procedures, IDEA "'guarantee[s] parents both an opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of any decisions they think inappropriate.'"  *AW ex rel. Wilson v. Fairfax Cnty. Sch. Bd.*, 372 F.3d 674, 678 (4th Cir. 2004) (quoting *Honig v. Doe*, 484 U.S. 305, 311-12 (1988)).

*ii.  Failure to State a Claim*

In my prior Memorandum Opinion, I said: "Arguably, in a generous construction of Count I, plaintiffs attempted to bring a stand-alone IDEA claim for the alleged denial of a FAPE, in addition to a § 1983 claim."  Mem. Op. at 14.  However, I also noted the following contention of plaintiffs: "Plaintiffs' claims are not 'IDEA' claims *per se*, but constitutional tort claims arising out of the deprivation of [a] federally protected statutory right to a FAPE guaranteed under [the] IDEA . . . ."  ECF 18-1 at 11 (opposing Carroll County Defendants' motion to

---

[10] Although IDEA has undergone amendments since the *Sellers* decision in 1998, these "rights" remain the backbone of its procedural framework, albeit under different code sections, which I have identified in brackets.

dismiss First Amended Complaint).[11]  Based on plaintiffs' characterization, I held that Count I

failed to state a claim under binding Fourth Circuit precedent.

In *Sellers*, 141 F.3d 524, the Fourth Circuit said plainly: "Because IDEA provides a

comprehensive remedial scheme for violations of its own requirements, we hold that parties may

not sue under section 1983 for an IDEA violation."  *See also Yancey v. New Balt. City Bd. of*

*Sch. Comm'rs*, 24 F. Supp. 2d 512, 514 n.1 (D. Md. 1998) ("Plaintiffs' § 1983 claim fails as a

matter of law because an IDEA violation cannot form the basis of a § 1983 claim.").  Because

plaintiffs had alleged no other "deprivation of any rights, privileges, or immunities secured by

the Constitution and law," apart from their allegations as to IDEA, I dismissed Count I.

As defendants note, plaintiffs have failed to amend Count I in any material way.  *See*

Carroll County Memo at 3-4.  Plaintiffs do not contend otherwise.  Accordingly, I see no reason

to alter my previous conclusion that Count I fails to state a claim under § 1983.  *See Ferdinand-*

*Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 777 (D. Md. 2010) ("By her failure to

---

[11] Plaintiffs assert that "R.W. is and was entitled to the equal protection of the law while a
student [at Carrolltown], to bodily integrity and the freedom from the ongoing threat of assault."
S.A.C. ¶ 41.  These allegations appear to be a vestige of plaintiffs' initial Complaint (ECF 1), in
which they lodged §§ 1983 and 1985 claims predicated on violations of the Fourteenth
Amendment.  *See* Complaint at 13 ("Count I – Claim for Deprivation of Constitutional Rights
under 42 U.S.C. § 1983, 20 U.S.C. § 1400, *and U.S. Const. Amend. XIV*") (emphasis added); *id.*
at 18 ("Count II - Claim for Deprivation of Constitutional Rights under 42 U.S.C. § 1985 *and*
*U.S. Const. Amend. XIV*") (emphasis added).

It appears that plaintiffs excised their Fourteenth Amendment claims from their First and
Second Amended Complaints.  *See* S.A.C. at 3 n.1 ("This Court . . . has already shown . . . its
disinclination to adopt other district courts' reconfigured notions of 'functional custody' in an
educational setting under either a due process or equal protection analysis . . . .  Those claims,
therefore, have been pared from this amendment . . . ."); F.A.C. at 3 n.1 (same).  Of note, the
headings to Counts I and II no longer refer to the Fourteenth Amendment.  Moreover, in
opposing the defendants' motions to dismiss, plaintiffs have not argued that Counts I and II
include an alleged Fourteenth Amendment violation.  Therefore, I will treat any such claims as
abandoned.  *See Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 777 (D. Md.
2010) ("By her failure to respond to [defendant's] argument" in a motion to dismiss, "the
plaintiff abandons her claim.").

respond to [defendant's] argument" in a motion to dismiss, "the plaintiff abandons her claim."). Moreover, because plaintiffs stated that their claims are "not 'IDEA' claims *per se*," I need not to address here whether the Carroll County Defendants violated IDEA.

Even if plaintiffs attempted to state a stand-alone IDEA claim in Count I, it would not prove viable under the Fourth Circuit's decision in *Sellers*. In that case, a learning disabled student and his parents sued a city school board and the school superintendent under, *inter alia*, IDEA and 42 U.S.C. § 1983, seeking compensatory and punitive damages. 141 F.3d at 525. The plaintiffs claimed that the defendants did not "evaluate [the student] for learning disabilities after certain test scores should have alerted them of the need to do so," and failed to provide him with a FAPE in the form of special education services. *Id.* at 525-26.

The plaintiffs sought a "tort-like remedy," to obtain "redress for a broad range of harms 'associated with personal injury, such as pain and suffering, emotional distress, harm to reputation, or other consequential damages." *Id.* at 527. Noting that IDEA "did 'not create a private cause of action for damages for educational malpractice,'" the Fourth Circuit rejected the plaintiffs' claims. *Id.* at 526 (quoting *Hall v. Vance Cnty. Bd. of Educ.*, 774 F.2d 629, 633 n.3 (4th Cir. 1985)). It observed that the "Court has never approved an award of compensatory or punitive damages under IDEA for a violation of its requirements." *Sellers,* 141 F.3d at 527. The Court explained that "[t]ort-like damages are simply inconsistent with IDEA's statutory scheme," the "touchstone" of which "is the actual provision of a free appropriate public education." *Id.* Notably, the Court said: "Compensatory or punitive damages would transform IDEA into a remedy for pain and suffering, emotional distress, and other consequential damages caused by the lack of a free appropriate public education," and that "result would be inconsistent with the structure of the statute, which so strongly favors the provision of and, where

appropriate, the restoration of educational rights.[1]" *Id.*; *see also id.* at 528 ("Not only are awards of compensatory and punitive damages inconsistent with IDEA's structure, they present acute problems of measurability.")

Here, as in *Sellers*, plaintiffs' claims are "indistinguishable from educational malpractice." *Id.* at 526. In sum, they allege that the Carroll County Defendants failed to train teachers and staff as to bullying, failed to protect R.W. from bullying, and, did not afford R.W. an appropriate IEP or FAPE, thereby causing tort-like injuries to R.W. and his parents. Moreover, they seek a tort-like remedy, in the form of compensatory and punitive damages for R.W.'s pain, suffering, medical expenses, and attorney's fees, all of which are inconsistent with IDEA. Most notably, plaintiffs have not identified any *educational* relief that they seek under the statute, such as a modification to R.W.'s IEP or a change in his school placement. Presumably, this is because such relief has already been achieved through IDEA's administrative process. Thus, plaintiffs have failed to state a claim under IDEA.

In view of the foregoing, I need not revisit the parties' contentions as to administrative exhaustion. Nor need I reach the Carroll County Defendants' arguments with respect to immunity under § 1983. I will dismiss Count I, with prejudice.

2. Count II

In Count II, plaintiffs reprise their claim against the Carroll County Defendants under IDEA, based on 42 U.S.C. § 1985, which prohibits conspiracies to interfere with civil rights. Plaintiffs assert that the Carroll County Defendants, "individually and in concert with one another, deprived the Plaintiff, R.W., of his right to a [FAPE] under [IDEA] by failing to impose discipline against the offending student, or—alternatively—effectively imposing discipline against the victim." S.A.C. ¶ 50.

I previously dismissed Count II of the First Amended Complaint for two primary reasons. First, I found it unlikely that a violation of IDEA can serve as the basis for a suit under 42 U.S.C. § 1985, given the Fourth Circuit's ruling in *Sellers*, 141 F.3d at 529, barring suit under § 1983 for an IDEA violation. *See B.D. ex rel. Dragomir v. Griggs*, No. 09-439, 2010 WL 2775841, *6 n.3 (W.D.N.C. July 13, 2010) ("Indeed, the comprehensive enforcement scheme of the IDEA shows that Congress intended to preclude claims pursuant to 42 U.S.C. §§ 1983 & 1985 for the violation of rights under the IDEA.") (citing *Sellers*, 141 F.3d at 529). Second, in the Fourth Circuit "[t]he law is well-settled . . . that a conspiracy between a corporation and its agents, acting within the scope of their employment, is a legal impossibility," *Marmott v. Maryland Lumber Co.*, 807 F.2d 1180, 1184 (4th Cir. 1986), and, "[t]he intracorporate conspiracy doctrine is equally applicable to governmental entities such as school districts." *Larson by Larson v. Miller*, 76 F.3d 1446, 1456 n.6 (8th Cir. 1996); *see, e.g., Hull v. Cuyahoga Valley Joint Vocational Sch. Dist.*, 926 F.2d 505, 510 (6th Cir. 1991) ("[P]laintiff is alleging a conspiracy between a school district superintendent, the executive director of the district, and a school administrator, all of whom are employees or agents of the Board. Since all of the defendants are members of the same collective entity, there are not two separate 'people' to form a conspiracy.").

Plaintiffs failed to amend Count II. Therefore, I see no reason to alter my previous ruling. I will dismiss Count II, with prejudice.

3. Count III

In Count III, plaintiffs bring claims against the Carroll County Defendants under Title II of the ADA, 42 U.S.C. § 12131 *et seq.*, and § 504 of the Rehabilitation Act, 29 U.S.C. § 794. As noted, they allege that the Carroll County Defendants "fail[ed] to ensure that R.W. was not the

victim of invidious discrimination by virtue of his disability, and . . . by making him bear the educational consequence by regressing him a grade level when that action clearly was not merited by his educational achievement." S.A.C. ¶ 54. They also allege that the Carroll County Defendants "retaliated" against R.W. for "asserting his disability rights." *Id.* ¶ 56. As I will explain, I am persuaded that plaintiffs have failed to state a claim under § 504 of the Rehabilitation Act and Title II of the ADA.

Title II of the ADA provides, in part: "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

Section 504 of the Rehabilitation Act provides, in part: "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a).

As to the merits, I need not address separately plaintiffs' claims under Title II of the ADA and § 504 of the Rehabilitation Act. Although there are distinctions in regard to the statutory causation language of these statutes, the Fourth Circuit said in *Halpern v. Wake Forest Univ. Health Sciences*, 669 F.3d 454 (4th Cir. 2012): "To the extent possible, we construe the ADA and Rehabilitation Act to impose similar requirements. Thus, despite the different language these statutes employ, they require a plaintiff to demonstrate the same elements to establish liability." *Id.* at 461 (internal citations omitted); *see also Hooven-Lewis v. Caldera*, 249 F.3d 259, 268 (4th Cir. 2001); *Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1264 n.4 (4th Cir. 1995).

Generally, "[i]n the context of a student excluded from an educational program, to prove a violation of either [the ADA or § 504], the plaintiff must establish that (1) he has a disability, (2) he is otherwise qualified to participate in the defendant's program, and (3) he was excluded from the program on the basis of his disability." *Halpern*, 669 F.3d at 461. It is undisputed that R.W. has a disability, and I will assume, *arguendo*, that he was qualified to participate in the educational program.

In *Sellers*, the Fourth Circuit underscored that "to establish a violation of section 504," the plaintiffs "must prove that they have been discriminated against—that they were 'excluded from the . . . benefit *due to discrimination* solely on the basis of the disability.'" *Sellers*, 141 F.3d at 528 (quoting *Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1265 (4th Cir. 1995) (emphasis in *Sellers*). By extension, virtually the same standard applies in an action under Title II of the ADA. Moreover, "[t]o prove discrimination in the education context, 'something more than a mere failure to provide the [FAPE] required by [IDEA] must be shown.'" *Sellers*, 141 F.3d at 528 (citation omitted). Of import here, the *Sellers* Court explained: "'[E]ither bad faith or gross misjudgment should be shown before a § 504 violation can be made out, at least in the context of education of handicapped children.'" *Sellers*, 141 F.3d at 529 (citations omitted); *accord Hoekstra By & Through Hoekstra v. Indep. Sch. Dist. No. 283*, 103 F.3d 624, 626-27 (8th Cir. 1996) (same, as to Title II of the ADA).

In my earlier ruling, I determined that plaintiffs failed to state a claim under § 504. I observed that plaintiffs had not addressed "an obvious defect in the Complaint: there is no allegation that R.W. was subject to discrimination *because of* his disability." Mem. Op. at 20. Additionally, I found unpersuasive plaintiffs' protestations that, based on Carrolltowne's initial refusal to allow Ms. Wright to visit the school for observation and the alleged retaliation by

showing R.W. pictures of "hostile" judges, *see id.* at 20, the First Amended Complaint adequately pleaded "bad faith or gross misjudgment." *Id.* at 21. As I noted, Ms. Wright was allowed to observe R.W.'s classes at Carrolltowne "a mere two school days" after the bullying incident of October 22, 2008, and the alleged retaliatory conduct in 2011 "had no bearing on whether defendants acted in bad faith or with gross misjudgment *three years earlier*." *Id.*

Defendants again maintain that, as in the First Amended Complaint, "the Plaintiffs' allegations against the [Carroll County] Defendants center around their response, or lack of a response, to th[e] alleged bullying." Carroll County Memo at 7. But, they assert: "At no point in the Second Amended Complaint do Plaintiffs allege that the actions or conduct of the [Carroll County] Defendants were either *because of*, or even motivated by, R.W.'s disability." *Id.*

The Second Amended Complaint offers no new facts to suggest "bad faith or gross misjudgment" by the Carroll County Defendants with respect to their treatment of R.W. Plaintiffs complain that R.W. was "taken off the graduation track [and] moved to a lower class grade," which deprived him of "an education benefit." Opp. at 3. Plaintiffs allege that the change in R.W.'s grade level was "clearly not merited by his educational achievement," S.A.C. ¶ 54. In conclusory fashion, they assert that this change occurred "because of his disability." *Id.* They also maintain that, despite being "the 'victim' of student-on-student violence, [R.W.] was treated more restrictively than the perpetrator." *Id.* In their view, this "is the very essence of purposeful discrimination." S.A.C. ¶ 44.

That defendants moved R.W., but not M., to a lower class grade does not, by itself, demonstrate bad faith or gross misjudgment, even if plaintiffs believe that it was "not merited by [R.W.'s] educational achievement." *Id.* ¶ 54. Even if plaintiffs' complaint were valid, it merely reflects a disagreement as to R.W.'s educational placement, which is not actionable. Moreover,

"'a mere failure to provide the [FAPE] required by [IDEA],'" standing alone, is not actionable "'in the context of education of handicapped children.'" *Sellers*, 141 F.3d at 528-29 (citations omitted).

In *Sellers*, *id.* at 529, the Fourth Circuit quoted the following illuminating passage from an Eighth Circuit decision, *Monahan v. Nebraska*, 687 F.3d 1164, 1170 (8th Cir. 1982):

> "The reference in the Rehabilitation Act to 'discrimination' must require, we think, something more than an incorrect evaluation, or a substantively faulty individualized education plan, in order for liability to exist. Experts often disagree on what the special needs of a handicapped child are, and the educational placement of such children is often necessarily an arguable matter. That a court may, after hearing evidence and argument, come to the conclusion that an incorrect evaluation has been made, and that a different placement must be required under [IDEA], is not necessarily the same thing as a holding that a handicapped child has been discriminated against solely by reason of his or her handicap."

To be sure, plaintiffs indicate that M., a fellow classmate, harbored antipathy towards R.W. based on R.W.'s disability. But, the suit contains no allegations that the conduct of the Carroll County Defendants was motivated by discrimination based on R.W.'s disability. Absent factual allegations suggesting discrimination based on R.W.'s disability, plaintiffs' claim that R.W. should not have been placed in a lower grade level is insufficient to state a claim under the ADA or § 504.

Although plaintiffs fail to allege facts showing that defendants discriminated against R.W. because of his disability, they allege that "Defendants . . . fail[ed] to ensure that R.W. was not the victim of invidious discrimination by virtue of his disability." S.A.C. ¶ 54. This allegation implicates a different theory of liability under § 504 and Title II of the ADA, which does not require that a defendant's conduct be motivated by a discriminatory animus. Specifically, drawing on the Supreme Court's decision in *Davis Next Friend LaShonda D. v. Monroe County Board of Education*, 526 U.S. 629 (1999), courts have held that "a school

district's deliberate indifference to pervasive, severe disability-based harassment that effectively deprived a disabled student of access to the school's resources and opportunities would be actionable under Section 504 and Title II [of the ADA]." *K.M. ex rel. D.G. v. Hyde Park Cent. Sch. Dist.*, 381 F. Supp. 2d 343, 360 (S.D.N.Y. 2005); *see, e.g.*, *S.S. v. E. Ky. Univ.*, 532 F.3d 445, 453 (6th Cir. 2008) (recognizing "a disability-based peer-on-peer harassment claim" predicated on *Davis*); *D.A. v. Meridian Sch. Dist. No. 2*, 289 F.R.D. 614, 628-29 (D. Idaho 2013) (same); *Werth v. Bd. of Dirs. of the Pub. Sch. of Milwaukee*, 472 F. Supp. 2d 1113, 1127 (E.D. Wis. 2007) (same); *Biggs v. Bd. of Educ. of Cecil Cnty.*, 229 F. Supp. 2d 437, 444-45 (D. Md. 2002) (same); *see also M.P. ex rel. K. v. Indep. Sch. Dist. No. 721*, 326 F.3d 975, 982 (8th Cir. 2003) (addressing plaintiff's disability-based peer-to-peer harassment claim under § 504, but not relying on *Davis*).

In the light most favorable to plaintiffs, they have lodged a *Davis*-type claim predicated on the Carroll County Defendants' alleged indifference to the disability-based harassment of R.W. by M., although they have not presented the claim as such. *See S.S.*, 532 F.3d at 454 (treating plaintiff's ADA and § 504 claims as a "disability-based peer-on-peer harassment claim," where the allegations concerned both "discriminatory responses to the harassment and, separately, a failure to respond to the harassment," because "his claims arise from the same allegations of peer-on-peer harassment"). Therefore, I will consider the viability of the *Davis* claim.

*Davis* involved a minor female student's claim for money damages under Title IX of the Education Amendments Act of 1972 ("Title IX"), 20 U.S.C. § 1681 *et seq.*[12] *See Davis*, 526

_____

[12] In language similar to Title II of the ADA and § 504 of the Rehabilitation Act, *supra*, Title IX provides: "No person in the United States shall, on the basis of sex, be excluded from

U.S. at 632-33.  She sued a county school board,[13] based on the indifference of school teachers and administrators to student-on-student sexual harassment at school.  *See id.*  Specifically, the plaintiff alleged that she had been subject to a five-month period of sexual harassment by a male student.  *See id.* at 633.  The harassment included vulgar statements, attempted touching of her chest and genital areas, and repeated sexually suggestive contact.  *See id.* at 633-34.  Both the student and her mother had reported each incident of harassment to the student's teachers, who informed the principal of the school.  *Id.* at 633-34.  Yet, harassment continued to occur while the students were under teacher supervision, and neither the teachers nor the principal followed up on the plaintiff's frequent complaints or attempted to separate the students.  *Id.* at 634.  School administrators also ignored the complaints of other female students who had been harassed.  *See id.*

The Supreme Court held that a Title IX claim against the school board for student-on-student harassment could be maintained upon a showing that school officials were "deliberately indifferent to sexual harassment, of which they [had] actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school."  *Davis*, 526 U.S. at 650.  Applying this standard, it found that the plaintiff had stated a claim under Title IX because school officials were aware that one of their students was sexually harassing and assaulting the plaintiff, yet did nothing to stop the harassment for five months.  *See Davis*, 526 U.S. at 653-54.

The Court offered a general illustration of actionable harassment, *id.* at 650-51:

---

participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).

    [13] The student also lodged her claim against individual school officials, who were dismissed from the case by the district court on the ground that Title IX does not provide for individual liability.  *See Davis*, 526 U.S. at 636.

The most obvious example of student-on-student sexual harassment capable of triggering a damages claim would thus involve the overt, physical deprivation of access to school resources. Consider, for example, a case in which male students physically threaten their female peers every day, successfully preventing the female students from using a particular school resource—an athletic field or a computer lab, for instance. District administrators are well aware of the daily ritual, yet they deliberately ignore requests for aid from the female students wishing to use the resource. The district's knowing refusal to take any action in response to such behavior would fly in the face of Title IX's core principles, and such deliberate indifference may appropriately be subject to claims for monetary damages. It is not necessary, however, to show physical exclusion to demonstrate that students have been deprived by the actions of another student or students of an educational opportunity on the basis of sex. Rather, a plaintiff must establish sexual harassment of students that is so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities.

Of import here, the Court cautioned: "Damages are not available for simple acts of teasing and name calling." *Id.* at 652. For example, a "child who refuses to go to school because the school bully calls him a 'scaredy-cat' at recess" will not have a claim under Section 504 or the ADA. *Id.* Nor will "a mere 'decline in grades'" suffice to show the denial of educational resources. *Id.* The Court also stated that, "in light of the inevitability of student misconduct[,] . . . official indifference to a single instance of one-on-one peer harassment" is not actionable. *Id.* at 652-53.

By analogy to *Davis*, courts have found that a school district's deliberate indifference to severe and pervasive harassment of a disabled child by his peers states a claim under § 504 of the Rehabilitation Act and Title II of the ADA, when five elements are satisfied: (1) the child is an individual with a disability; (2) he or she was harassed based on that disability; (3) the harassment was sufficiently severe or pervasive that it altered the condition of his or her education and created an abusive educational environment; (4) the defendant had actual knowledge of the harassment; and (5) the defendant was deliberately indifferent to the

harassment.  *See S.S.*, 532 F.3d at 454; *Werth*, 421 F. Supp. 2d at 1128-29; *Biggs*, 229 F. Supp. 2d at 444-45; *K.M.*, 381 F. Supp. 2d at 360-61.

Clearly, plaintiffs' allegations satisfy the first two elements of this claim.  They have alleged that R.W. is a disabled child and that he was harassed by M. based on that disability. However, plaintiffs fail to satisfy the third element of the claim.

To illustrate, *K.M.*, *supra*, 381 F.Supp. 2d 343, stands in stark contrast to this case. There, the disabled child had been subjected to two years of verbal abuse and physical attacks at school.  *See* 381 F. Supp. 2d at 348.  Although the child or his mother had reported the attacks to school officials, no action was taken to protect him from further harassment.  *Id.*  Rather, the school advised the mother to keep the child out of school for an indeterminate period, and did not arrange any educational services for him during his absence of several months.  *See id.* at 348-49.  The court found that a reasonable jury could conclude that the child "was subjected to severe and pervasive peer abuse, that this abuse was known to teachers and administrators in the District, and that it so altered the conditions of [his] school experience that he felt he could not attend school for the better part of a year."  *Id.* at 360-61; *see also D.A.*, 289 F.R.D. at 628-31 (concluding that student stated a claim under § 504 and the ADA based on severe and pervasive disability-based harassment by peers, which was known to teachers and school administrators who "never investigated or took any steps to prevent or remediate the harassment").

Unlike in *Davis* or *K.M.*, plaintiffs' allegations demonstrate a rather unfortunate but exceedingly brief period of harassment of R.W.  School had been in session for only a few weeks when plaintiffs complained that R.W. was in "fear" of M., but they did not explain why.  M. assaulted R.W. on October 22, 2010, but the facts alleged do not show that school officials were made aware of the severity of M.'s bullying until that incident.  There are no allegations of

prolonged conduct by M. or specific complaints by plaintiffs that were repeatedly and deliberately ignored.  As the *Davis* Court noted, a claim for deliberate indifference does not offer relief for a "child who refuses to go to school because the school bully calls him a 'scaredy-cat' at recess."  526 U.S. at 652.

To be sure, the incident of October 22, 2008, was serious.  With respect to events after that date, plaintiffs vaguely aver that "further incidents" of bullying took place.  S.A.C. ¶ 21.  However, plaintiffs have not alleged any facts about these events or incidents to show that they involved harassment qualitatively similar to what occurred on October 22, 2008, and were not "mere acts of teasing and name calling."  *Davis*, 526 U.S. at 652.  Given "the inevitability of student misconduct," a deliberate indifference claim for student-on-student harassment is not available to redress isolated instances of bullying.  *Davis*, 526 U.S at 652-53.

Moreover, about one month after the incident on October 22, 2008, the Wrights removed R.W. from the school, because of his anxiety.  *See* S.A.C. ¶ 26.  Therefore, to the extent of further harassment after October 22, 2008, it could not have been prolonged.  Although R.W.'s anxiety made him unable to "return to a school environment" after the 2008 Thanksgiving holiday, *id.*, plaintiffs' allegations do not show that, in the one month that R.W. remained at school after the incident of October 22, 2008, his educational environment was altered as a result of severe and pervasive harassment.

Moreover, even if the allegations satisfy the third element, plaintiffs have not alleged facts to satisfy the fourth and fifth elements of a *Davis* claim.

As to the fourth element, plaintiffs must show that defendants had "actual knowledge" of the severity and pervasiveness of the harassment.  *D.A.*, 289 F.R.D. at 629.  The Supreme Court has made clear that defendants may not be held liable under a negligence standard, *i.e.*, for

failing to address severe and pervasive harassment of which they *should have* known.  *See Davis*, 526 U.S. at 642 (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1999)).  The Second Amended Complaint is devoid of any allegations that, prior to the incident of October 22, 2008, the Carroll County Defendants had actual knowledge that M. was severely and persistently harassing R.W.  Plaintiffs merely allege that Ms. Wright communicated R.W.'s "fear of a male peer" to R.W.'s teacher, Ms. Fliegel, and informed some unidentified Carrolltowne personnel that R.W. had "expressed fears of reporting to school."  These communications certainly did not reveal that R.W. was the subject of severe, persistent, and pervasive bullying by M. or anyone else, so as to put the Carrolltowne school teachers and staff on actual notice.  And, even if the Carrolltowne teachers and administrators should have known of the extent of the bullying, that does not satisfy the actual knowledge standard required for a deliberate indifference claim.

Nor have plaintiffs alleged facts to satisfy the fifth element: deliberate indifference.  Once again, the Second Amended Complaint omits any allegations that, prior to October 22, 2008, plaintiffs informed the Carrolltowne staff of actual harassment by M.  Rather, plaintiffs told school personnel of R.W.'s fear of M.  Thus, defendants lacked actual knowledge of any bullying by M. prior to the incident on October 22, 2008.  The fact that an assault occurred on October 22, 2008, certainly does not establish deliberate indifference to M.'s offensive behavior prior to October 22, 2008.  And, when the defendants learned of the incident on October 22, 2008, they acted immediately by alerting Ms. Wright of the incident, inviting her to school, and allowing her to observe R.W. in class for three days.  Thus, unlike in *Davis*, school officials did not ignore or stave off efforts by R.W. or his parents to address the disturbing situation.

Plaintiffs' complaint that school personnel seated R.W. in close proximity to M. both before and after the incident of October 22, 2008, does not alter the landscape. *See* S.A.C. ¶ 21. Even if plaintiffs did not want R.W. to be seated near M., and even if keeping the two near each other reflected poor judgment, the failure to separate M. and R.W. does not amount to deliberate indifference.

In sum, plaintiffs have failed to state a claim for deliberate indifference for student-on-student disability-based harassment.

Plaintiffs also appear to have lodged a retaliation claim in Count III, predicated on photographs shown to R.W. by his Carrolltowne speech therapist, "tending to portray members of the judiciary as hostile to students." S.A.C. ¶ 56. To establish a prima facie case of retaliation under either Act, a plaintiff must show that "(1) he engaged in protected conduct, (2) he suffered an adverse action, and (3) a causal link exists between the protected conduct and the adverse action." *Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 154 (4th Cir. 2012) (as to ADA retaliation); *see Hooven-Lewis v. Caldera*, 249 F.3d 259, 272 (4th Cir. 2001) (same, as to Rehabilitation Act retaliation). To be actionable, retaliation must be such that it dissuades a reasonable person from pursuing his complaint; "petty slights or minor annoyances" do not qualify. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68 (2006). Put simply, showing a photograph allegedly depicting a "hostile" judge to a student does not fit the bill. *Compare A.C. ex rel. J.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 698 (6th Cir. 2013) ("Having a government official appear at their door armed not only with the power to take their disabled child away but also with allegations that they are actively and nearly fatally abusing that child would surely be enough to dissuade many reasonable parents from seeking accommodations at school.").

Therefore, I find that Count III of plaintiffs' Second Amended Complaint fails to state a claim under Title II of the ADA and § 504 of the Rehabilitation Act. Accordingly, I need not address the Carroll County Defendants' contention that there is no individual liability under either statute or that plaintiffs failed to exhaust administrative remedies, which are decidedly complex issues on which the Fourth Circuit has not opined in this context.[14]

4.  Count IV

In Count IV, plaintiffs lodge claims against the Pessin Katz Defendants under Title II of the ADA, *supra*, 42 U.S.C.A. § 12132, and § 504 of the Rehabilitation Act, *supra*, 29 U.S.C. § 794. According to the Pessin Katz Defendants, they are not subject to liability on either claim because Title II of the ADA applies only to public entities, and § 504 applies only to recipients of federal funds. They contend that neither Pessin Katz nor the individual Pessin Katz attorneys qualifies as public entities or recipients of federal funds. *See* Pessin Katz Memo at 4-6. As noted, plaintiffs failed to oppose the merits of the Pessin Katz Motion, although they did not formally abandon the claim. In any event, the law squarely supports defendants' arguments.

Title II of the ADA prohibits discrimination by a "public entity." 42 U.S.C. § 12132. "Public entity," as defined in the ADA, 42 U.S.C. § 12131(1)(A)-(B), means "any State or local government," or "any department, agency, special purpose district, or other instrumentality of a

---

[14] I note that Eleventh Amendment sovereign immunity generally extends to "state agents and state instrumentalities," *Cash v. Granville Cnty. Bd. of Educ.*, 242 F.3d 219, 222 (4th Cir. 2001), and Maryland law has consistently treated local school boards as agencies of the state. *See, e.g.*, *Chesapeake Charter, Inc. v. Anne Arundel Cnty. Bd. of Educ.*, 358 Md. 129, 747 A.2d 625 (2000). However, the ADA contains a provision abrogating the states' sovereign immunity under the Eleventh Amendment, 42 U.S.C. § 12202, which the Fourth Circuit has held is valid as to state institutions of higher education. *See, e.g.*, *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474 (4th Cir. 2005) (holding that Title II of ADA validly abrogates sovereign immunity of state institutions of higher education). The defendants have not asserted the Board's sovereign immunity with respect to Count III, and therefore I do not address that issue here.

State or States or local government."  By its plain language, this definition "does not include private individuals or private entities."  *Horen v. Bd. of Educ. of Toledo City Sch. Dist.*, 594 F. Supp. 2d 833, 846 (N.D. Ohio 2009); *see also Adams v. Montgomery Coll. (Rockville)*, 834 F. Supp. 2d 386, 395 (D. Md. 2011) (explaining that ADA definition of public entity "does not include individual persons"); *Pathways Psychosocial v. Town of Leonardtown, MD*, 133 F. Supp. 2d 772, 780 (D. Md. 2001) (same).

*Horen*, *supra*, 594 F. Supp. 2d 833, is instructive.  In that case, the parents of a disabled child sued a private law firm and one of the firm's lawyers retained by the school board in connection with the child's IDEA proceedings.  *See Horen*, 594 F. Supp. 2d at 839.  Just as in this case, the lawyer was present at meetings to address the child's IEP, to which the parents objected.  *Id.*  The court held that the parents could not sue the lawyer or the law firm under Title II of the ADA for their role in the IDEA proceedings, because neither qualified as a public entity under the statute, and therefore "neither ha[d] obligations under Title II of the ADA."  *Id.* at 846 (citing *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 589 (1999)); *see also Edison v. Douberly*, 604 F.3d at 1310 (11th Cir. 2010) ("A private contractor does not . . . become liable under Title II [of the ADA] merely by contracting with the State to provide governmental service, essential or otherwise."); *Green v. New York*, 465 F.3d 65, 79 (2d Cir. 2006) (concluding that private hospital was not a "public entity" for purposes of the ADA because "[a] private hospital performing services pursuant to a contract with a municipality even if it does so according to the municipality's rules and under its direction, is not a creature of any governmental entity," and "[i]nstead, it is a parallel private entity").

The court's reasoning in *Horen* is persuasive, and I have not located any contradictory authority. Accordingly, I conclude that the Pessin Katz Defendants are not subject to suit under Title II of the ADA.

I reach the same result with respect to § 504 of the Rehabilitation Act, which applies to a "program or activity receiving federal financial assistance." 29 U.S.C. § 794(a). Even if a school such as Carrolltowne receives federal financial assistance, outside legal counsel retained by the school do not fall within the scope of § 504. *See, e.g.*, *Horen*, 594 F. Supp. 2d at 846 (dismissing § 504 claims against outside law firm and attorneys retained to represent school board, because they did not qualify as a "program or activity receiving federal financial assistance"); *see also Emerson v. Thiel Coll.*, 296 F.3d 184, 190 (3d Cir. 2002) (per curiam) (holding that disabled college student failed to state a claim under the Rehabilitation Act against individual defendants employed by a college, or college's outside legal counsel, because they "d[id] not receive federal aid"). As the Fourth Circuit explained in *Disabled in Action v. Mayor & City of Baltimore*, 685 F.2d 881 (4th Cir. 1982), "nothing in the language or legislative history of the [Rehabilitation] Act indicates a congressional intention to reach" the "indirect beneficiaries" of federal assistance who benefit by virtue of business dealings. *Id.* at 884-85. Otherwise, the statute "would apply to every customer of every enterprise subsidized by the federal government." *Id.* Therefore, I conclude that plaintiffs cannot sue the Pessin Katz Defendants under § 504 of the Rehabilitation Act.

Accordingly, Count IV will be dismissed, with prejudice.

5. Count V

In Count V, plaintiffs reassert a state law claim for "Common Law Gross Negligence." In Maryland,[15] gross negligence is "'[a]n intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them.'" *Taylor v. Harford Cnty. Dep't of Social Servs.*, 384 Md. 213, 238, 862 A.2d 1026, 1034 (2004) (citation and some internal quotation marks omitted). In *Foor v. Juvenile Services*, 78 Md. App. 151, 552 A.2d 947 (1989), the Maryland Court of Special Appeals explained, *id.* at 170, 552 A.2d at 956 (some internal quotation marks omitted):

> Gross negligence has been equated with "wilful and wanton misconduct," a "wanton or reckless disregard for human life or for the rights of others." *White v. King,* 244 Md. 348, 223 A.2d 763 (1966). In *Romanesk v. Rose,* 248 Md. 420, 423, 237 A.2d 12 (1968), the Court, quoting from 4 Blashfield, *Cyclopedia of Automobile Law and Practice* § 2771 (1946), held that "a wrongdoer is guilty of gross negligence or acts wantonly and willfully only when he inflicts injury intentionally or is so utterly indifferent to the rights of others that he acts as if such rights did not exist." *See also Liscombe v. Potomac Edison Co.,* 303 Md. 619, 495 A.2d 838 (1985). When dealing with such a standard, bald and conclusory allegations will not suffice; specificity is required. *Smith v. Gray Concrete Pipe Co.,* 267 Md. 149, 168, 297 A.2d 721 (1972); *Nast v. Lockett,* 312 Md. 343, 370, 539 A.2d 1113 (1988).

In my prior Memorandum Opinion, I canvassed Maryland case law that I need not revisit here, and concluded: "[T]here is absolutely nothing in the [First] Amended Complaint that comes

_____

[15] Maryland is the forum state, and its law governs this Court's choice-of-law analysis with respect to plaintiffs' state law claim. *Ground Zero Museum Workshop v. Wilson*, 813 F. Supp. 2d 678, 696 (D. Md. 2011) ("When choosing the applicable state substantive law while exercising diversity or supplemental jurisdiction, a federal district court applies the choice of law rules of the forum state.") (Citing *ITCO Corp. v. Michelin Tire Corp., Commercial Div.*, 722 F.2d 42, 49 n.11 (4th Cir. 1983)). With respect to tort claims, Maryland applies the principle of *lex loci delicti*, *i.e.*, the law of the "place of the alleged harm," *Proctor v. Wash. Metro. Area Transit Auth.*, 412 Md. 691, 726, 990 A.2d 1048, 1068 (2010), which in this case is Maryland. Thus, the Court will apply Maryland law with respect to plaintiff's common law claim of gross negligence. *See Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007) (The court "must apply the substantive law of the forum state including its choice of law rules)."

remotely close to alleging facts that would rise to the level of 'malice, evil intention, or wanton, willful, or reckless disregard' of R.W.'s rights sufficient to state a cause of action for gross negligence." Mem. Op. at 25 (citation omitted). In particular, I explained, *id.* at 22:

> [T]he Complaint is devoid of adequate "factual allegations." In a conclusory manner, plaintiffs allege that defendants, generally, were aware that their conduct was insufficient to protect R.W. But, the Complaint contains no facts to support that assertion, apart from the following: some Carrolltowne personnel were on notice that R.W. had "expressed fears of reporting to school," *id.* ¶ 16; in spite of Principal Ball's promise to Mrs. Wright to address the situation, some Carrolltowne personnel were uninformed of the issue, *id.* ¶ 21; R.W. was "attacked" by 'M.' after Carrolltowne had been put on notice of R.W.'s "fears of reporting to school," *id.* ¶ 17; and, after the "attack," R.W. and M. were seated in class in "very close proximity" to each other. *Id.* ¶18.

I remain persuaded that plaintiffs have failed to state a claim for gross negligence. Arguably, a gross negligence claim would lie if particular defendants were repeatedly warned of a serious threat to R.W.'s safety, yet failed to take any precautions to protect him. *See Doe v. Bd. of Educ. of Prince George's Cnty.*, 888 F. Supp. 2d 659, 670 (D. Md. 2011) (finding that "Plaintiffs stated a facially plausible claim" for gross negligence by school vice principal and school board with respect to student subjected to "frequent and severe sexual harassment" by classmate where vice principal, despite being notified of the harassment, "failed to take action to mitigate and/or eliminate the alleged harassment," "assigned Classmate to [student's] class despite being notified of the alleged harassment," and "failed, without justification, to follow through on a promise to implement remedial measures for the protection of [student]").

However, as discussed, *supra*, plaintiffs have not alleged facts demonstrating that any of the Carroll County Defendants had actual knowledge of M.'s harassment of R.W. prior to the incident of October 22, 2008. Rather, Ms. Wright informed Fliegel and other unidentified staff of R.W.'s general fear of M. and fears of reporting to school. Nor have plaintiffs alleged that the kind of physical harassment that R.W. experienced on October 22, 2008, continued after that

date. Even if the Carrolltowne teachers and staff should have known of the harassment before October 22, 2008, such a claim would merely amount to negligence, not gross negligence. Accordingly, plaintiffs did not set forth a claim for gross negligence.

Therefore, I will dismiss Count V, with prejudice.

\*        \*        \*

Having concluded that all of plaintiffs' claims should be dismissed for the reasons stated, I need not resolve any of the defendants' contentions regarding the viability of various claims against particular defendants; the defense of statute of limitations; or defendants' contention that they are protected by statutory and qualified immunity.

6. Rule 11

Rule 11 of the Federal Rules of Civil Procedure provides a bulwark against frivolous and factually unsupported claims. *See Brubaker v. City of Richmond*, 943 F.3d 1363, 1373 (4th Cir. 1991). Titled "Representations to the Court," Rule 11(b) states:

> (b) REPRESENTATIONS TO THE COURT. By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>
> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
>
> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and
>
> (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

"The primary purpose of Rule 11 is to punish violators and deter parties and their counsel from pursuing unnecessary or unmeritorious litigation." *Moody v. Arc of Howard Cnty., Inc.*, 474 F. App'x 947, 950 (4th Cir. 2012). "[A] complaint containing allegations unsupported by any information obtained prior to filing, or allegations based on information which minimal factual inquiry would disprove, will subject the author to [Rule 11] sanctions." *In re Kunstler*, 914 F.2d 505, 516 (4th Cir. 1990). In *Morris v. Wachovia Securities, Inc.*, 448 F.3d 268, 277 (4th Cir. 2006), the Fourth Circuit said plainly: "Factual allegations fail to satisfy Rule 11(b)(3) when they are 'unsupported by any information obtained prior to filing.'" (Citation omitted).

Plaintiffs have twice amended their lengthy complaint. Yet, aside from the section of the Second Amended Complaint that describes each defendant's job position, I am unable to locate *any* reference to either the actions or inactions of several of the individual Carroll County Defendants named in this suit. It appears to me that, in plaintiffs' Second Amended Complaint, plaintiffs attribute specific conduct to <u>five of the twelve</u> individual Carroll County Defendants named by them. In other words, seven of the individuals who were sued by plaintiffs are not alleged to have taken any action or inaction with respect to R.W. These persons are: Seidel, Shreeve, Bauer, Foley, Harrison, Guthrie, and Gray. Indeed, plaintiffs have not even alleged that these individuals were employed by Carrolltowne or the Board, nor were they members of the Board during the relevant time period. Thus, these defendants have been sued under Counts I, II, III and V, without any factual basis for the claims.

Plaintiffs' claims are perhaps most egregious with respect to defendant Gray, who is currently the Director of Special Education at Carrolltowne. According to the Affidavit of defendant Stephen H. Guthrie, Superintendent of the School System, filed by the Carroll County Defendants in support of their motion to dismiss the First Amended Complaint, Gray was not

hired by Carroll County until August 2010, almost two years after the alleged bullying took place. *See* Affidavit of Stephen H. Guthrie ¶ 4 (ECF 11-3).

By lodging such unfounded allegations, plaintiffs and their counsel demonstrated a cavalier attitude towards the impact of litigation on the lives of those embroiled by it. Put another way, the complaints suggest a reckless disregard for the weighty social and financial costs imposed on defendants who are forced, without foundation, to defend themselves in litigation and carry the burdens and concerns associated with it.

Because defendants have not filed a motion for sanctions, I will not impose them. Nevertheless, counsel is cautioned that Rule 11(c)(3) permits a court to impose sanctions, on its own initiative, for a violation of Rule 11(b).[16]

### Conclusion

Plaintiffs' motions to disqualify and to strike will be denied. Defendants' motions to dismiss will be granted. An Order follows.

Date: August 26, 2013

                                       /s/

                                    Ellen Lipton Hollander
                                    United States District Judge

---

[16] Before doing so, "Rule 11 requires a district court to order counsel 'to show cause why conduct specifically described in the order has not violated Rule 11(b)' . . . in order to allow counsel to respond to specific asserted Rule 11 violations." *In re Bees*, 562 F.3d 284, 289 (4th Cir. 2009) (quoting Fed. R. Civ. P. 11(c)(3)).